TREG TAYLOR
ATTORNEY GENERAL

Ronald W. Opsahl (Bar No. 2108081)
Ryan E. Farnsworth (Bar No. 2305047)
Assistant Attorney General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Fax: (907) 276-3697
Email: ron.opsahl@alaska.gov
         ryan.farnsworth@alaska.gov

Kathleen C. Schroder (*pro hac vice* pending)
Mark E. Champoux (*pro hac vice* pending)
Davis Graham & Stubbs LLP
1550 Seventeenth St., Suite 500
Denver, CO 80202
Telephone: (303) 892-9400
Fax: (303) 893-1379
Email: katie.schroder@davisgraham.com
         mark.champoux@davisgraham.com

Attorneys for the State of Alaska

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA, ) | Case No. _____ |
| ) | |
| Plaintiffs, ) | |
| ) | **COMPLAINT FOR DECLARATORY** |
| v. ) | **JUDGMENT AND INJUNCTIVE** |
| ) | **RELIEF** |
| BUREAU OF LAND ) | |
| MANAGEMENT, UNITED STATES ) | |
| DEPARTMENT OF THE INTERIOR, ) | |
| DEBRA HAALAND, in her official ) | |
| capacity as Secretary of the Department ) | |
| of the Interior, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## **INTRODUCTION**

1.     This lawsuit challenges a regulation promulgated by Defendant U.S.

Bureau of Land Management ("BLM") concerning the management and administration

of the National Petroleum Reserve in Alaska (the "Petroleum Reserve" or "NPR–A") that is *ultra vires*, arbitrary, capricious, contrary to law, and must be set aside.

2.     Congress first established the approximately 23.5-million-acre area as a national petroleum reserve and later directed BLM to facilitate oil production there through the issuance of oil and gas leases to help the nation gain greater energy independence. For several decades, BLM worked to institute an oil and gas leasing program that addressed and balanced environmental protection concerns, local impacts, and the national need to develop new sources of oil production, which resulted in oil and gas lease sales beginning in the 1990s through the 2010s.

3.     But in 2024, without any further or different direction or authorization from Congress, BLM issued a new rule that dramatically alters management of the Petroleum Reserve to significantly curtail oil production there. The rule effectively precludes approval of any new oil exploration and production activities and sets aside over half of the Petroleum Reserve as de facto off limits for resource production. It does so despite, and in direct contradiction to, Congress's mandate that BLM facilitate oil and gas production from the Petroleum Reserve. Moreover, in issuing the rule, BLM assumed for itself authority and discretion never granted to it by Congress. Making matters worse, BLM issued the rule after a rushed notice-and-comment process that failed to provide a meaningful opportunity for input from the State and other stakeholders.

4.     The result is a rule that violates Congress's express mandates concerning the Petroleum Reserve and that significantly harms the State of Alaska and its people by unlawfully restricting economic activity that would otherwise result in revenues

supporting the State's services and programs for its people, particularly those living in or near areas where resource production occurs.

5. First established as a fuel reserve for the U.S. Navy in 1923, Congress transferred the administration of the Petroleum Reserve from the Navy to the Department of the Interior ("DOI") in 1976 through the Naval Petroleum Reserves Production Act (the "Production Act").

6. At the time, the Nation was in an energy crisis caused by the crushing effects of an oil embargo by the Organization of Petroleum Exporting Countries ("OPEC"). By transferring the Petroleum Reserve, Congress sought to spur exploration and development to help meet the Nation's oil and gas needs and defend against similar shortages in the future. *See, e.g.*, 122 Cong. Rec. H2617, H2622 (daily ed. Mar. 31, 1976) (statement of Rep. Anderson) (explaining that developing the NPR–A would be "a significant step that this Congress can take toward energy self-sufficiency for the United States").

7. To this end, Congress approved private oil and gas leasing in the Petroleum Reserve in 1980. *N. Alaska Envtl. Ctr. v. Norton*, 361 F. Supp. 2d 1069, 1072 (D. Alaska 2005) (explaining that Congress directed DOI to create an "expeditious program of competitive leasing of oil and gas" for resource development in the Petroleum Reserve); *see also, e.g.*, 126 Cong. Rec. 20,530, 20,531 (1980) (statement of Rep. Udall) (explaining that private oil and gas leasing would address the "serious question [of] whether [Congress is] going to get going on a meaningful drilling program" in the Petroleum Reserve); *id.* at 20,537 (statement of Rep. Regula) (explaining how the nation

"desperately need[s] to free [itself] from blackmail by the OPEC countries" through exploration and development of NPR–A); *see also* 126 Cong. Rec. 29,489 (1980) (statement of Sen. Stevens) ("[Congress] can no longer delay efforts which would increase the domestic supply of oil and lessen our reliance on imports.").

8.      Over the years, BLM consistently recognized Congress's intent to promote resource exploration, development, and production in the Petroleum Reserve. For instance, BLM's original implementing regulations finalized in 1977 affirmed the intent to prioritize oil and gas activity over maximum protection measures. 42 Fed. Reg. 28,723, 28,723 (June 3, 1977) ("Maximum protection of designated special areas does not imply a prohibition of exploration or other activities."). BLM's position remained the same following the Congressional directive to establish a private leasing program. *See, e.g.*, 46 Fed. Reg. 55,494, 55,497 (Nov. 9, 1981) (describing its rulemaking as "carrying out the Congressionally approved oil and gas leasing program for the National Petroleum Reserve"). Pursuant to this directive, oil and gas leasing in the Petroleum Reserve under BLM's management began in the 1990s and continued into the 2010s.

9.      On May 7, 2024, however, BLM published the final "Management and Protection of the National Petroleum Reserve in Alaska" (the "Rule"). The Rule unlawfully upends the priorities, substantive standards, and processes for management and administration of the Petroleum Reserve and directly contravenes BLM's statutory authority and obligations.

10.      Specifically, the Rule elevates the protection of surface values to the exclusion of oil and gas production and, in effect, enshrines a new management standard

*Alaska v. Bureau of Land Management*, Case No. _____
State of Alaska's Complaint                                                Page 4 of 39

for the Petroleum Reserve for which there is no statutory support. Through the Rule, BLM has gifted itself—without any Congressional authorization—the power to "adopt[ ] whatever conditions, restrictions, and prohibitions" it sees fit to mitigate the effects of proposed oil and gas activities, including the power to "condition[ ], delay[ ] action on, or deny[ ] some or all aspects" of proposed oil and gas activities. 89 Fed. Reg. 38,712, 38,757 (May 7, 2024) (§ 2361.10(a)). Moreover, the Rule creates a presumption against new oil and gas leasing and development within "Special Areas," while at the same time imbuing BLM with unchecked discretion to expand such areas within the Petroleum Reserve.

11.     The Rule defies BLM's Congressional mandate regarding the management of the Petroleum Reserve and purports to express agency authority and discretion that Congress never granted.

12.     The real-world consequences of this illegal power-grab are significant. For the State of Alaska, the Rule will negatively impact the State's economy through lost job opportunities and suppressed spending and development by private companies. It will also harm the State by decreasing the State's revenues from oil and gas lease royalties and bonuses, which, through a variety of State spending programs, directly benefit Alaskans that reside in and near areas of resource production.

13.     Because the Rule lacks any statutory authority, and for the additional reasons set forth below, the Rule should be vacated in its entirety.

## PARTIES

14.     The Plaintiff State of Alaska ("State") is a sovereign state, with an interest in resource production within its borders. The State submitted comments on the proposed Rule, 88 Fed. Reg. 62,025 (Sept. 8, 2023), during the short comment period that BLM provided.

15.     Defendant BLM is an agency of the United States Department of the Interior charged with management of the Petroleum Reserve under the Production Act. BLM promulgated the Rule.

16.     Defendant DOI is an agency of the United States responsible for oversight of BLM.

17.     Defendant Debra Haaland is sued in her official capacity as Secretary of the United States Department of the Interior. The Secretary holds the highest position within the Department of the Interior, has ultimate responsibility for overseeing the Department and its agencies and ensuring their compliance with all applicable federal laws, and has specific responsibilities related to the administration of the Petroleum Reserve.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action because it arises under the laws of the United States. *See* 28 U.S.C. § 1331. The State seeks judicial review of final agency action under the Administrative Procedure Act and declaratory and injunctive relief. *See* 5 U.S.C. §§ 701–706; 28 U.S.C. §§ 2201, 2202.

19.     The APA provides for judicial review of final agency action. 5 U.S.C. § 702. Formal rules are a final agency action subject to review under the APA. *See id.*

20.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C). A reviewing court shall also "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." *Id.* § 706(2)(D).

21.     Venue is proper in this Court and this Court has personal jurisdiction over the parties because this action is brought against agencies of the United States and officers of those agencies in their official capacities, a substantial part of the events or omissions giving rise to the claims occurred in the District of Alaska, and all or a substantial part of the property that is subject of the action is situated in the District of Alaska. *See* 28 U.S.C. § 1391(e)(1).

## STATUTORY FRAMEWORK

### The Naval Petroleum Reserves Production Act

22.     The Production Act, 42 U.S.C. §§ 6501–07, placed the Petroleum Reserve within the jurisdiction of DOI. The Secretary of the Interior has delegated its responsibilities and duties under the Production Act to BLM.

23.     Under the Production Act, the primary purpose of the Petroleum Reserve is oil and gas production.

24.     To this end, the Production Act requires the Secretary to "conduct an expeditious program of competitive leasing of oil and gas in the [Petroleum] Reserve" to private entities. 42 U.S.C. § 6506a(a).

25.     The Production Act does not establish any general management standards. Rather, it provides that "[a]ctivities undertaken pursuant to [it] shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the [Petroleum Reserve]." 42 U.S.C. § 6506a(b).

26.     The Production Act allows the Secretary to designate areas "containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value" and identifies two such areas—the Utukok River and the Teshekpuk Lake areas. 42 U.S.C. § 6504(a). These areas are known as "Special Areas." The Production Act directs that "[a]ny exploration" within these areas "shall be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve." *Id.*

### The Alaska National Interest Lands Conservation Act

27.     In 1980, Congress passed the Alaska National Interest Lands Conservation Act ("ANILCA"). *See* 16 U.S.C. §§ 3101–3233. ANILCA's stated purpose was to "provide[] sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska, and at the same time provide[] adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people[.]" *Id.* § 3101(d).

*Alaska v. Bureau of Land Management*, Case No. _____
State of Alaska's Complaint                                          Page 8 of 39

28.     Through ANILCA, Congress designated more than 100 million acres of federal land in Alaska as new or expanded conservation system units ("CSUs"). At the same time, Congress unequivocally directed that no additional public lands in Alaska will be included in CSUs after ANILCA's passage. *See* 16 U.S.C. § 3103(c).

## The National Environmental Policy Act

29.     Under the National Environmental Policy Act ("NEPA"), federal agencies must take a "hard look" at the environmental consequences of their actions and "explain their decisions to the public." *Earth Island Inst. v. Muldoon*, 82 F.4th 624, 631 (9th Cir. 2023). When taking major federal actions that significantly affect the quality of the human environment, federal agencies must prepare a "detailed statement" concerning foreseeable environmental effects. 42 U.S.C. § 4332(C). Such procedural requirements "ensure that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 988 (9th Cir. 2020) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 23 (2008)). Major federal actions include new or revised agency rules. 40 C.F.R. § 1508.1(q)(2) (2023).

30.     To comply with NEPA, an agency must: (1) prepare an environmental impact statement ("EIS"); (2) prepare an environmental assessment ("EA"); or (3) apply a categorical exclusion. *Friends of the Inyo v. U.S. Forest Serv.*, 103 F.4th 543 (9th Cir. 2024); *accord* 40 C.F.R. 1501.3(a) (2023).

31.     An EIS or EA must identify reasonable alternatives to the agency's proposed action. *See* 40 C.F.R. §§ 1501.5(c)(2), 1502.14. An EIS or EA also must assess

the effects or impacts of an agency action and the alternatives thereto. *See id.*

§§ 1501.5(c)(2), 1502.16 (2023). Effects include "those resulting from actions which may

have both beneficial and detrimental effects, even if on balance the agency believes that

the effects will be beneficial." *Id.* § 1508.1(g)(4).

32.     An agency may apply a categorical exclusion only when no "extraordinary

circumstances" exist "in which a normally excluded action may have a significant effect"

or, if extraordinary circumstances exist, the agency determines "that there are

circumstances that lessen the impacts or other conditions sufficient to avoid significant

effects." 40 C.F.R. § 1501.4(b)(1) (2023).

33.     Under BLM's NEPA regulations, actions categorically excluded from

preparation of an EIS or EA include, among other actions: "Policies, directives,

regulations, and guidelines: that are of an administrative, financial, legal, technical, or

procedural nature; or whose environmental effects are too broad, speculative, or

conjectural to lend themselves to meaningful analysis and will later be subject to the

NEPA process, either collectively or case-by-case." 43 C.F.R. § 46.210(i) (2023). BLM's

NEPA regulations identify 12 extraordinary circumstances. *See id.* § 46.215.

34.     BLM's decision to apply a categorical exclusion is a final agency action

subject to judicial review under the APA.

### The Administrative Procedure Act

35.     BLM's promulgation of the Rule is a final agency action subject to judicial

review under the APA. *See* 5 U.S.C. § 702.

36.     The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 15 (2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)).

37.     The APA requires that, when an agency promulgates formal rules, it "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c).

38.     Executive Order 12,866 provides direction on federal rulemaking processes governed by the APA. *See* Exec. Order 12,866 of Sept. 30, 1993, 58 Fed. Reg. 6,113 (Oct. 4, 1993). It directs that "before issuing a notice of proposed rulemaking, each agency should, where appropriate, seek the involvement of those who are intended to benefit from and those expected to be burdened by any regulation (including, specifically, State, local, and tribal officials)." *Id.* § 6(a).

39.     Additionally, Executive Order 12,866 directs that "each agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days." *Id.* Courts have observed that "90 days is the 'usual' amount of time allotted for a comment period." *Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, 501 F. Supp.3d 792, 819– 20 (N.D. Cal. 2020) (quoting *California v. U.S. Dep't of Interior*, 381 F. Supp.3d 1153, 1177 (N.D. Cal. 2019)); *accord Prometheus Radio Project v. FCC*, 652 F.3d 431, 453 (3d Cir. 2011)).

40. Executive Order 13,563 echoes the direction of Executive Order 12,866. *See* Exec. Order 13,563 of Jan. 18, 2011, 76 Fed. Reg. 3,821 (Jan. 21, 2011). It confirms that comment periods "should generally be at least 60 days." *Id.* § 2(b) (emphasis added). It also proclaims that agencies should base regulations "on the open exchange of information and perspectives among State, local, and tribal officials, experts in relevant disciplines, affected stakeholders in the private sector, and the public as a whole." *Id.* § 2(a).

## **STATEMENT OF FACTS**

## I.    **History of the Petroleum Reserve**

### A.    *Early Oil and Gas Activity in the Petroleum Reserve*

41. The Petroleum Reserve stretches over 23 million acres of land along the north coast of Alaska. The United States Geological Survey estimates that the Petroleum Reserve contains 8.7 billion barrels of oil and 25 trillion cubic feet of natural gas.

42. Between 1923 and 1976, the Petroleum Reserve was operated under the jurisdiction of the Navy and designated as an oil reserve for national defense and military emergencies.

43. During this time, extensive exploration projects, including the first-ever Arctic oil and gas exploration project, led to the discovery of a series of oil and gas deposits in and near the Petroleum Reserve, including at Umiat, Cape Simpson, Fish Creek, Prudhoe Bay, and the east Barrow gas field.

**B.     Congressional Intent to Maximize Oil and Gas Resources in the Petroleum Reserve**

44.     In 1976, persistent oil shortages plagued the Nation, and Congress sought to address this crisis by, in part, redirecting the purpose of the Petroleum Reserve.

45.     Specifically, Congress passed Public Law 94-258 to establish "national petroleum reserves" for the "total energy needs of the Nation," including the Petroleum Reserve, among others.

46.     Through this act, Congress prepared the Petroleum Reserve for future development and production (which would be authorized by later Congressional acts) by (i) withdrawing the Petroleum Reserve from "all forms of entry and disposition under the public land laws"; (ii) transferring jurisdiction of the Petroleum Reserve from the Navy to DOI; (iii) continuing the development and production operations at the South Barrow gas field; and (iv) directing "further petroleum exploration of the reserve." Pub. L. No. 94-258, §§ 102-104, 90 Stat. 303, 303–05 (1976).

47.     As part of this exploration effort, Congress ordered comprehensive studies to "determine the best overall procedures to be used in the development, production, transportation, and distribution of petroleum resources" in the Petroleum Reserve, as well as "the values of, and best uses" for its lands. *Id.* at § 105.

48.     Importantly, Congress prioritized oil and gas exploration over surface values, such as "significant subsistence, recreational, fish and wildlife, or historical or scenic value," by specifying that the protection thereof must be "consistent with the requirements of this Act for the exploration of the reserve." *Id.* at § 104; *see also*

H. Conf. Rep. No. 94-942, at 21 (1976) (explaining that the statutory language concerning the "'maximum protection of such surface values' is not a prohibition of exploration-related activities within such areas," but is instead intended to ensure "that such exploration operations will be conducted in a manner which will minimize the adverse impact on the environment").

49.     Following the enactment of the Production Act, BLM acted pursuant to Congress's intent when managing the Petroleum Reserve.

50.     In 1977, BLM issued implementing regulations for the management of the Petroleum Reserve. In the preamble of those regulations, BLM made "clear" that the "continuation of oil and gas exploration is a *requirement* of the Act." 42 Fed. Reg. 28,720 (May 27, 1977) (emphasis added) (confirming that "[t]he objectives section includes that mandate"); *id.* at 28,721 (43 C.F.R. § 2361.0-2 ) (confirming the "Objectives" of the regulations are that conservation efforts be "consistent with the requirements of the Act for petroleum exploration of the reserve"); *see also* 41 Fed. Reg. 40,484 (Sept. 20, 1976) (describing "[t]he purpose of this proposed rulemaking is to provide procedures to explore the oil and gas production potential of . . . [the] Petroleum Reserve" and noting that conservation efforts are subordinate to the "required exploration program").

51.     Similarly, the implementing regulations limit the Secretary's authority to apply "maximum protection" measures in "Special areas" by mandating that they be "consistent with the requirements of the Act for the exploration of the reserve." *See* 42 Fed. Reg. at 28,722 (43 C.F.R. § 2361.1(a)).

52.     When initially designating Special Areas, BLM reiterated Congress's intent to prioritize oil and gas activity over maximum protection measures in the Petroleum Reserve, including within Special Areas. 42 Fed. Reg. 28,723, 28,723 (June 3, 1977) ("Maximum protection of designated special areas does not imply a prohibition of exploration or other activities."). BLM defined only a handful of such measures, which were narrow in scope and included "(1) rescheduling activities and use of alternative routes, (2) types of vehicles and loadings, (3) limiting types of aircraft in combination with minimum flight altitudes and distances from identified places and (4) special fuel handling procedures." 42 Fed. Reg. at 28,722.

53.     In 1979, DOI concluded its initial evaluation of the Petroleum Reserve and submitted its resulting report to Congress (the "Report"). The Report includes findings with respect to resource estimates in the Petroleum Reserve, potential issues with development, and multiple economic analyses on management approaches and its impacts. In the Report, DOI estimated that the Petroleum Reserve contained between 1.0 and 16.5 billion barrels of oil alone, and between 3.5 trillion to 35 trillion cubic feet of gas resources. Final Report of the 105(b) Economic and Policy Analysis (Dec. 15, 1979).

### C.     *A Congressionally Directed Private Leasing Program for Resource Development and Production in the Petroleum Reserve*

54.     Following DOI's completion and submission of the Report, Congress approved private oil and gas leasing in the Petroleum Reserve in 1980 through a new section within the Production Act. *See* Department of the Interior Appropriations Act of 1981, Pub. L. No. 96-514, 94 Stat. 2957; 42 U.S.C. § 6506a ("The Secretary shall

*Alaska v. Bureau of Land Management*, Case No. _____
State of Alaska's Complaint                                                                 Page 15 of 39

Case 3:24-cv-00144   Document 1   Filed 07/03/24   Page 15 of 39

conduct an expeditious program of competitive leasing of oil and gas in the [Petroleum] Reserve.").

55.    In doing so, Congress sought to combat the "serious question [of] whether [Congress is] going to get going on a meaningful drilling program." 126 Cong. Rec. 20,530, 20,531 (1980) (statement of Rep. Udall); *id.* at 20,532 (statement of Rep. Udall) ("We are for oil exploration"); *id.* at 20,533 (statement of Rep. McDade) (describing the Petroleum Reserve as presenting "the most promising drilling program on the public lands of the United States."); *see also id.* at 20,537 (statement of Rep. Regula) (explaining how the nation "desperately need[s] to free [itself] from blackmail by the OPEC countries" through exploration and development of NPR–A).

56.    Congress favored exploration efforts from the private sector because the federal program was limited and expensive, *see* S. Rep. No. 96-985, at 34 (1980), and planned to eventually phase out the federal exploration program, H.R. Rep. No. 96-1147, at 32-33 (1980).

57.    Congress also declined the opportunity to adopt competing amendments that would have promoted conservation over resource production. 126 Cong. Rec. at 20,535 (statement of Rep. Young) (describing competing bill that was rejected: "It is a nothing bill. It allows no development of oil. It elevates the Fish and Wildlife Department into supreme commander of those lands. They set aside special areas, and if that department sees one chance of wildlife being damaged, there shall be no drilling.").

58.    The Act provided that half of "[a]ll receipts from sales, rentals, bonuses, and royalties on leases issued pursuant to this section shall . . . be paid to the State of

Alaska" with "priority" given to the "subdivisions of the State most directly or severely impacted by development of oil and gas leased under this Act." 42 U.S.C. § 6506(a)(l).

59. The Act expressly exempted the Petroleum Reserve from the Federal Land Policy and Management Act's ("FLPMA") land use planning and wilderness study requirements at 43 U.S.C. §§ 1712 and 1782. 42 U.S.C. § 6506a(c).

60. As before, BLM acted in accordance with Congressional intent and issued new leasing regulations in 1981 but left the 1977 special management regulations as they were.

61. BLM's contemporaneous statements further demonstrated its understanding of Congress's intent. *See, e.g.*, 46 Fed. Reg. 55,494, 55,497 (Nov. 9, 1981) ("This final rulemaking contains the procedures that will be followed in carrying out the Congressionally approved oil and gas leasing program for the National Petroleum Reserve–Alaska, a program that will serve the national interest through the leasing and development of oil and gas resources that will reduce the dependence of the United States on foreign produced oil and gas.").

### D. *Development and Production of the Petroleum Reserve*

62. BLM held initial lease sales in the Petroleum Reserve from 1982 to 1984, but further leasing stalled until the late 1990s.

63. In 1997, President Clinton directed the Secretary of the Interior to initiate a planning process for the northeast portion of the Petroleum Reserve.

64.     Consequently, BLM began developing Integrated Activity Plans ("IAPs"), along with EISs, to govern the leasing program in the Petroleum Reserve and evaluate where leasing should occur, under what conditions, and whether to alter Special Areas.

65.     BLM completed its IAP/EIS for the northeast portion of the Petroleum Reserve in 1998 and one for the northwest portion in 2003.

66.     Later on, BLM completed IAPs for the entire Petroleum Reserve. Specifically, BLM prepared an EIS and ROD in 2012 and 2013, respectively, and then prepared an EIS and ROD in 2020. In 2022, BLM issued another ROD that adopted the 2020 EIS's no action alternative with modifications, thus effectively adopting a modified version of the 2013 ROD.

67.     The 2022 IAP designates five Special Areas: the Teshekpuk Lake Special Area, Colville River Special Area, Utukok River Uplands Special Area, Kasegaluk Lagoon Special Area, and Peard Bay Special Area. During the EIS process for the 2020 IAP, BLM recommended removing the Colville River Special Area.

68.     In 1999, BLM held an oil and gas lease sale for the northeast portion of the Petroleum Reserve, leading to the "issuance of 133 leases for approximately $104.6 million in rentals and lease bonus bids." 2 *Law of Federal Oil and Gas Leases* § 27.04.

69.     Over the ensuing years, BLM conducted additional lease sales in the Petroleum Reserve frequently, including sales in every year from 2010 to 2019.

70.     Though there were lease sales for tracts throughout the Petroleum Reserve, the bulk of such activity concentrated in two areas: "the central area south of Smith Bay (where there have been major oil and gas discoveries)" and "the easternmost portion of

*Alaska v. Bureau of Land Management*, Case No. _____
State of Alaska's Complaint                                                    Page 18 of 39

[the Petroleum Reserve], near the Colville River and the village of Nuiqsut (where there have been a number of recent major discoveries and exploration and development activities)." 2 *Law of Federal Oil and Gas Leases* § 27.04.

71.     The aforementioned discoveries led to an expansion of oil and gas exploration and development, including a new discovery of oil and gas in the Pikka Unit and in the Horseshoe area, which is estimated to contain at least 700 million barrels of oil.

72.     In 2017, the first commercial development on Native-owned lands within the Petroleum Reserve began producing oil.

73.     Since 2017, multiple additional projects in the Petroleum Reserve have begun to produce oil.

74.     These projects generated substantial benefits and are critically important to the State, its economy, and its people.

75.     The oil and gas industry is the largest component of the Alaskan economy, contributing 10 percent of the state's total gross domestic product in 2017. National Petroleum Reserve in Alaska – Integrated Activity Plan and Environmental Impact Statement (June 2020), at 3-350.

76.     In 2018, the oil and gas industry employed over 9,000 workers in Alaska, not including the "thousands of indirect jobs in security, catering, accommodations, facilities management, transportation, engineering, and logistics that support the oil and gas industry." National Petroleum Reserve in Alaska – Integrated Activity Plan and

Environmental Impact Statement (June 2020), at 3-350. Moreover, "[j]obs in the oil and gas extraction sector are the highest paying jobs in the state." *Id.*

77.    Additionally, the state government in Alaska greatly depends on petroleum revenues. In fiscal year 2018, oil and gas revenues accounted for 80 percent of all unrestricted revenue in the state general fund. National Petroleum Reserve in Alaska – Integrated Activity Plan and Environmental Impact Statement (June 2020), at 3-351. And in 2019, the Petroleum Reserve generated more than $56 million in oil and gas lease revenue, of which the State received half.[1] *See* 42 U.S.C. § 6506(a)(l).

78.    The State uses revenue from the NPR-A to support NPR-A Impact Mitigation Grants that may be transferred into the Alaska Permanent Fund, Public School Trust Fund, Power Cost Equalization and Rural Electric Capitalization Fund, and General Fund. *See* Alaska Stat. § 37.05.530(c)–(e), (g).

79.    Alaska's North Slope Borough ("NSB") receives and uses grants from the NPR–A Impact Mitigation Fund to address the needs of the villages and its residents in and near the Petroleum Reserve. National Petroleum Reserve in Alaska – Integrated Activity Plan and Environmental Impact Statement (June 2020), at 3-351. For fiscal year 2020, the total amount recommended for the NSB from the NPR–A Fund is about $13.39 million for various projects for the communities of Utqiagvik, Anaktuvuk Pass, Atqasuk, Nuiqsut, and Wainwright. *Id.*

---

[1] https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/about/alaska.

*Alaska v. Bureau of Land Management*, Case No. _____
State of Alaska's Complaint                                                        Page 20 of 39

## II.    BLM's Arbitrary and Unlawful Adoption of the Rule

80.    The Rule adopts management standards and a management framework for the Petroleum Reserve and Special Areas that are inconsistent with the Production Act and ANILCA. Most significant, the Rule contorts the statutory purpose of the Petroleum Reserve by elevating resource protection over resource development.

### A.    The Rule's Management of the Petroleum Reserve

81.    As a legal basis for the Rule, BLM cited its obligation under FLPMA that it "'take any action necessary to prevent unnecessary or undue degradation' of all BLM-administered public lands, including within the NPR–A." 89 Fed. Reg. at 38,716 (citing 43 U.S.C. § 1732(b)).

82.    The Rule mandates that BLM "*protect* surface resources by adopting whatever conditions, restrictions, and prohibitions it deems necessary or appropriate to *mitigate* reasonably foreseeable and significantly adverse effects of proposed oil and gas activities." 89 Fed. Reg. at 38,757 (§ 2361.10(a)) (emphasis added). The Rule further elaborates that the conditions, restrictions, or prohibitions that BLM may adopt to "protect" surface resources "may involve conditioning, delaying action on, or denying some or all aspects of proposed oil and gas activities[.]" 89 Fed. Reg. at 38,757 (§ 2361.10(a)).

### B.    The Rule's Management of Special Areas Within the Petroleum Reserve

83.    The Rule designates more than 13 million acres of land—over half of the Petroleum Reserve—as Special Areas. 89 Fed. Reg. at 38,758 (§ 2361.20).

84.     The Rule establishes a management standard of "maximum protection" of surface values in Special Areas, which again elevates protection above resource production. Specifically, the Rule articulates the "management priority" within Special Areas "to assure *maximum protection* of significant resource values, consistent with the requirements of the Act for exploration and production of the Reserve." 89 Fed. Reg. at 38,759 (§ 2361.40) (emphasis added).

85.     The Rule's definition of "significant resource value" gives BLM unbounded discretion to define a resource value as significant. The Rule defines this term as "any surface value, including subsistence, recreational, fish and wildlife, historical, scenic, or other surface value that the Bureau identifies as significant and supports the designation of a Special Area." 89 Fed. Reg. at 38,757 (§ 2361.5).

86.     The Rule allows BLM to delay or deny proposed oil and gas activities in Special Areas. Specifically, the Rule requires BLM to "take such steps as are necessary to avoid the adverse effects of proposed oil and gas activities on the significant resource values of Special Areas." *Id.* at 38,759 (§ 2361.40(a)). Such a step "includes, but is not limited to, conditioning, delaying action on, or denying proposals for activities, either in whole or in part[.]" *Id.*

87.     Additionally, the Rule creates a presumption that BLM will not offer new oil and gas leases, nor permit new oil and gas activities or infrastructure associated with existing leases, within Special Areas. The Rule provides that BLM "[o]n lands within Special Areas that are allocated as available for future oil and gas leasing or new infrastructure," BLM "will presume that proposed oil and gas activities *should not be*

*permitted*" except where "specific information . . . clearly demonstrates that" (1) "those activities can be conducted with no or minimal adverse effects on significant resource values" or (2) "unless they are necessary to comport with the terms of a valid existing lease." *Id.* (§ 2361.40(f)) (emphasis added).

88.     Furthermore, the Rule memorializes land use allocations in Special Areas, including areas closed to new oil and gas leasing and unavailable for new infrastructure, as identified in maps in effect on the Rule's effective date. 89 Fed. Reg. at 38,759 (§ 2361.40(d)). In these areas, the Rule prohibits new leasing and infrastructure except in "limited circumstances" identified in the Rule. *Id.* (§ 2361.40(e)).

89.     The Rule manages Special Areas effectively under the same standard as CSUs. For example, under ANILCA, BLM may approve transportation or utility systems in and across CSUs for which there is no other applicable law only upon a determination that "such system would be compatible with the purposes for which the unit was established" and "there is no economically feasible and prudent alternative route for the system." 16 U.S.C. § 3165. Similarly, on lands in Special Areas allocated as available for new infrastructure, BLM will presume that new infrastructure will not be permitted unless "those activities can be conducted with no or minimal adverse effects on significant resource values or unless they are necessary to comport with the terms of a valid existing lease." 89 Fed. Reg. at 38,759 (§ 2361.40(f)). In lands in Special Areas allocated as unavailable to new infrastructure, BLM will not approve new infrastructure except in even more limited circumstances. *Id.* (§ 2361.40(e)).

90.     The Rule will result in ever-expanding Special Areas managed for "maximum protection" of surface values. The Rule requires BLM, at least every 10 years, to evaluate whether to designate new, or to expand existing, Special Areas. 89 Fed. Reg. at 38,758 (§ 2361.30(b)(1)). But, even before such evaluation, BLM may unilaterally adopt "interim measures" to manage lands under consideration for designation as new or modified Special Areas as if they are Special Areas. *Id.* at 38,759 (§ 2361.30(b)(4)). Furthermore, the Rule limits BLM's management discretion by prohibiting BLM from removing lands from Special Areas except "when *all* of the significant resource values that support the designation are no longer present." *Id.* (§ 2361.30(c)) (emphasis added).

91.     The Rule's requirement that BLM regularly review Special Areas, and its limitation on removing lands from Special Areas, effectively manages Special Areas as wilderness. In fact, BLM has identified "wilderness" as a value in the Utukok River Uplands Special Area. *See* 89 Fed. Reg. at 38,737. As a result, the Special Area designation cannot be removed until wilderness values are no longer present.

### C.    *Effects of the Rule on the State of Alaska, Its People, and Its Resources*

92.     Because the Rule limits, if not entirely prohibits, oil and gas leasing and new oil and gas development in the Petroleum Reserve, the Rule's economic effects will reverberate throughout the State and its local economies. Oil and gas exploration activities generate hundreds of millions of dollars of economic activity, employing workers for ice road construction, transportation crews, seismic crews, drillers and rig crews, and camps. Additionally, robust exploration programs help to maintain contractor

capacity within the State for all oil and gas developments, and so reduced exploration could impact exploration capacity statewide.

93.     The Rule will negatively impact State and local revenues. The State will lose corporate income tax and oil and gas production tax revenue, and both the State and local governments would lose property tax revenue from forgone exploration and development.

94.     The Rule will have significant impacts to health and safety of, and to low income and minority residents of, the State. By effectively prohibiting future oil and gas leasing and discouraging future development, the Rule will reduce revenues otherwise available to the NPR–A Impact Mitigation Fund, which supports projects for local communities most impacted by oil and gas development, including projects that promote public health and safety. For the same reason, the Rule also increases environmental justice impacts on under-served and disproportionately impacted communities.

95.     The Rule will adversely impact the State, North Slope communities, and small businesses even before BLM implements it. The Rule introduces significant regulatory uncertainty for future exploration and development activities in the Petroleum Reserve, thus discouraging capital investments.

96.     The Rule's impacts are not only economic. The Rule will significantly impact state-managed wildlife, including caribou and birds, and their habitats; marine mammals; historic and cultural resources; ecologically significant areas; and threatened and endangered species and their habitats. *See* 88 Fed. Reg. at 62,029–31, 62,033, 62,034.

*Alaska v. Bureau of Land Management*, Case No. _____     Page 25 of 39
State of Alaska's Complaint

Case 3:24-cv-00144   Document 1   Filed 07/03/24   Page 25 of 39

### D. BLM's Actions to Promulgate the Rule

97.     BLM did not publish an Advance Notice of Proposed Rulemaking to solicit public input on the issues that BLM intended to address in the Rule.

98.     BLM published the proposed rules in the Federal Register on September 8, 2023 ("Proposed Rule"). *See* 88 Fed. Reg. 62,025 (Sept. 8, 2023).

99.     BLM initiated consultation with tribes and Alaska Native Corporations on the Proposed Rule only two weeks before publishing the Proposed Rule. 89 Fed. Reg. at 38,719. This outreach did not meaningfully involve these entities.

100.    BLM did not involve the State prior to publication of the Proposed Rule. Two days before the Proposed Rule was published, BLM staff called the State to alert it to the forthcoming publication. 88 Fed. Reg. at 38,718. Phone calls placed by BLM staff to the State two days prior to publication of the Proposed Rule do not constitute a meaningful effort to involve the State.

101.    The Federal Register notice published with the Proposed Rule provided for a 60-day comment period ending on November 7, 2023. *Id.* at 62,025.

102.    BLM reluctantly extended the comment period by an additional 30 days through piecemeal actions. BLM first extended the comment period for 10 calendar days. *See* 88 Fed. Reg. 72,985 (October 24, 2023). BLM then extended the comment period for an additional 20 calendar days. *See* 88 Fed. Reg. 80,237 (Nov. 17, 2023). This piecemeal series of extensions left stakeholders uncertain of the actual time to comment on the Proposed Rule.

103.    The comment period of September 8, 2023 through December 7, 2023 fell squarely within the whaling and subsistence hunting seasons, thus limiting the participation of North Slope communities.

104.    Further, the 60-day comment period on the Draft Coastal Plain Oil and Gas Leasing Program Supplemental EIS wholly overlapped with the initial 60-day comment period on the Proposed Rule. Notice of this Draft Supplement EIS was published on the same day as notice of the Proposed Rule. *See* 88 Fed. Reg. 62,104 (Sept. 8, 2023). The Draft Supplemental EIS affects many of the same stakeholders as the Proposed Rule, including Alaska Native Corporations and North Slope oil and gas operators.

105.    BLM recognized that "the timing for the public comment was difficult and not ideal." 88 Fed. Reg. at 38,718.

106.    Numerous stakeholders, including the State of Alaska, requested further extension of the comment period for an additional 90 days. BLM, however, rejected these calls for further extension. BLM asserted that "[a] 5-month comment period far exceeds the typical duration for rulemaking comment periods." 89 Fed. Reg at 38,718.

107.    BLM announced the final Rule on April 19, 2024, merely 134 days after close of the comment period. The Rule was published in the Federal Register on May 7, 2024.

108.    By publishing the Rule on May 7, 2024, BLM attempted to insulate it from Congressional action pursuant to the Congression Review Act.  This statute allows Congress and the President to overturn agency rules enacted in the last 60 days of a

Case 3:24-cv-00144   Document 1   Filed 07/03/24   Page 27 of 39

legislative session. *See* 5 U.S.C. § 802. In the spring of 2024, this period for the 2024 legislative session was estimated to start in mid- to late May 2024.

109.    By failing to afford the State and its constituents, including Alaska Native Corporations and affected stakeholders, adequate notice of the Proposed Rule and public comment opportunity, BLM prevented the State and its constituents from providing meaningful public input on the Rule. Had BLM provided a reasonable and adequate opportunity for meaningful public participation, BLM may have avoided some or all of the Rule's adverse impacts.

110.    In addition to providing an unreasonably abbreviated public comment period, BLM took other shortcuts to finalize the rule. Most significant, it declined to prepare a federal summary impact statement. Executive Order 13,132 requires agencies to prepare federal summary impact statements when regulations have federalism implications, *i.e.*, "have substantial direct effects on the States." *See* Exec. Order 13,132, §§ 1(a), 6(b)(2)(B), 64 Fed. Reg. 43,256 (Aug. 10, 1999). Even though the State receives 50 percent of all receipts from "sales, rentals, bonuses, and royalties on leases" in the Petroleum Reserve, BLM concluded that the Rule "does not have a substantial direct effect on the States." 89 Fed. Reg. at 38,753.

111.    BLM also did not prepare a Final Regulatory Flexibility Analysis in accordance with 5 U.S.C. § 604. *See* Economic Analysis for Final Regulation: Management and Protection of the National Petroleum Reserve in Alaska. BLM concluded that the Rule "will not have a significant economic impact on a substantial number of small entities." *Id.* at 1. BLM incorrectly characterized many of the Rule's

Case 3:24-cv-00144   Document 1   Filed 07/03/24   Page 28 of 39

provisions as "increas[ing] clarity, updat[ing] references to other regulatory requirements, and improv[ing] internal BLM processes." *Id.* at 3. Although BLM characterized two changes as potentially generating economic costs or benefits—the provisions governing the designation and amendment of Special Areas, and the provisions governing management of oil and gas activities in Special Areas—BLM concluded that these provisions would not have a significant economic impact. *See id.*

### E. *BLM's Application of a Categorical Exclusion to the Rule*

112.     BLM determined that the Rule was categorically excluded from preparation of an EIS or EA because it is "of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case." 89 Fed. Reg. at 38,755.

113.     In the preamble to the final and proposed Rules, BLM contradicted this determination. BLM repeatedly recognized that the Rule modified BLM's management of the Petroleum Reserve. *See, e.g.*, 89 Fed. Reg at 38,753 (recognizing that "[t]he final rule will affect the relationship between operators, lessees, and the BLM" and "this rule does modify the management approach the BLM will take in the Reserve"). Furthermore, BLM observed that the Rule will tangibly impact the Petroleum Reserve. *See, e.g.*, 89 Fed. Reg. 38,721 ("[T]he final rule strengthens provisions that will support the BLM's management of important wildlife habitat and other surface resources in the Reserve."); 88 Fed. Reg. at 62,038 ("The proposed rule would affect the relationship between operators, lessees, and the BLM[.]").

114.     BLM further determined that the Rule "do[es] not involve any of the extraordinary circumstances listed in 43 CFR 46.215." *Id.*

115.     By not preparing an EIS or EA, BLM did not consider reasonable alternatives to the Rule or identify potential environmental impacts associated with these alternatives. *See* 40 C.F.R. §§ 1501.5(c)(2), 1502.16 (2023).

116.     By not preparing an EIS or EA, BLM did not allow the participation of the State or stakeholders such as the North Slope Borough as cooperating agencies, as permitted by 40 C.F.R. § 1501.8.

## FIRST CLAIM FOR RELIEF
**(Violation of the Production Act and APA)**

117.     The State realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

118.     Under the APA, if a reviewing court finds that an agency action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," the court must hold the action unlawful and set it aside. 5 U.S.C. § 706(2)(C).

119.     The Rule violates the Production Act because it elevates protection of surface values to the exclusion of oil and gas production.

    a)     The Rule's mandate that BLM "*protect* surface resources by adopting whatever conditions, restrictions, and prohibitions it deems necessary or appropriate to *mitigate* reasonably foreseeable and significantly adverse effects of proposed oil and gas activities," 89 Fed. Reg. at 38,757 (§ 2361.10(a)) (emphasis added), exceeds BLM's authority under the Production Act. The Production Act does not

authorize BLM to establish this management standard for the Petroleum Reserve. It not does not use the term "protect" or establish any general management standard for activities within the Petroleum Reserve. *See* 42 U.S.C. § 6506a(b). Further, the authorization to "mitigate" effects of proposed oil and gas activities does not allow BLM to deny or preclude oil and gas activities entirely.

b) The Rule improperly allows BLM to adopt conditions, restrictions, or prohibitions to "protect" surface resources that "may involve conditioning, delaying action on, or denying some or all aspects of proposed oil and gas activities[.]" *See* 89 Fed. Reg. at 38,757 (§ 2361.10(a)). BLM lacks authority to take these actions and, particularly, may not delay or deny oil and gas activities under existing or future oil and gas leases.

c) The Rule unlawfully grants BLM unchecked discretion to impose "whatever conditions, restrictions, and prohibitions it deems necessary." *See* 89 Fed. Reg. at 38,757 (§ 2361.10(a)).

d) The Rule improperly adopts land use planning requirements. The Production Act expressly exempts lands in the Petroleum Reserve from land use planning under FLPMA. *See* 42 U.S.C. § 6506a(c).

120. The Rule's management of Special Areas also exceeds BLM's authority under the Production Act.

a) The Rule's management standard of "maximum protection" of surface values in Special Areas is inconsistent with the Production Act. *See* 89 Fed. Reg. at 38,759 (§ 2361.40). The Production Act does not impose a management standard of

Case 3:24-cv-00144   Document 1   Filed 07/03/24   Page 31 of 39

"maximum protection" of surface values within Special Areas. Rather, the Production

Act directs that oil and exploration within Special Areas "shall be conducted in a manner

which will assure the maximum protection of such surface values[.]" 42 U.S.C.

§ 6504(a).

    b)  The Rule's presumption against new oil and gas leasing and new oil

and gas activities and infrastructure associated with existing leases within Special Areas

violates the Production Act. *See* 89 Fed. Reg. at 38,759 (§ 2361.40(f)). Likewise, the

Rule's closure of portions of Special Areas to new oil and gas leasing and designation as

unavailable for new infrastructure violates the Production Act. *Id.* (§ 2361.40(d)). The

Production Act does not allow BLM to exclude oil and gas exploration and development

from Special Areas. Rather, the Production Act expressly allows oil and gas exploration

to occur within Special Areas, stating that "[a]ny exploration within [Special Areas]. . .

*shall be conducted* in a manner which will assure the maximum protection of such

surface values[.]" 42 U.S.C. § 6504(a) (emphasis added).

    c)  The Rule improperly directs BLM to "take such steps as are

necessary to avoid the adverse effects of proposed oil and gas activities on the significant

resource values of Special Areas," including "conditioning, delaying action on, or

denying proposals for activities[.]" *See* 89 Fed. Reg. at 38,759 (§ 2361.40(a)). BLM lacks

authority to take these actions and, particularly, may not delay or deny oil and gas

activities under existing or future oil and gas leases.

    d)  The Rule improperly manages Special Areas as de facto wilderness

and requires that BLM conduct regular review of Special Areas. The Production Act,

*Alaska v. Bureau of Land Management*, Case No. _____
State of Alaska's Complaint               Page 32 of 39

Case 3:24-cv-00144  Document 1  Filed 07/03/24  Page 32 of 39

however, expressly exempts lands in the Petroleum Reserve from wilderness management and wilderness reviews under FLPMA. *See* 42 U.S.C. § 6506a(c).

e) The Rule arbitrarily affords BLM unbounded discretion to identify "significant resource values" that justify designation of Special Areas by defining "significant resource value" as "*any* surface value, including subsistence, recreational, fish and wildlife, historical, scenic, or othe*r surface value that [BLM] identifies as significant and supports the designation of a Special Area*." 89 Fed. Reg. at 38,757 (§ 2361.5) (emphasis added). This definition arbitrarily affords BLM unbridled discretion. Moreover, it is inconsistent with the Production Act, which identifies the surface values that are to be considered and protected through the NPR–A planning process as only "environmental, fish and wildlife, and historical and scenic values," 42 U.S.C. §6503(b), and "subsistence, recreational, fish and wildlife, or historical or scenic value." 42 U.S.C. §6504(a).

121. For these reasons and the reasons set forth in the State's and public's comments on the Proposed Rule, the Rule violates the Production Act and is arbitrary, capricious, an abuse of discretion, in excess of statutory limitations, not in accordance with law, without observance of the procedures required by law, contrary to constitutional right or privilege, and in excess of statutory jurisdiction and authority, in violation of the APA. Accordingly, the Rule should be vacated in its entirety.

*Alaska v. Bureau of Land Management*, Case No. _____
State of Alaska's Complaint                                                      Page 33 of 39
Case 3:24-cv-00144   Document 1   Filed 07/03/24   Page 33 of 39

## SECOND CLAIM FOR RELIEF
### (Violation of ANILCA and APA)

122.    The State realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

123.    ANILCA declares that no additional public lands in Alaska shall be included in CSUs. *See* 16 U.S.C. § 3103(c).

124.    Under the Rule, Special Areas in the Petroleum Reserve are de facto CSUs.

125.    The Rule improperly elevates the protection of surface resources in the Special Areas of the Petroleum Reserve above resource production.

126.    Under the Rule, Special Areas would effectively be managed as CSUs.

127.    By promulgating the Rule, BLM has created an impermissible end-run around ANILCA's prohibition against additional CSUs in Alaska.

128.    For these reasons and the reasons set forth in the State's and public's comments on the Proposed Rule, the Rule violates ANILCA and is arbitrary, capricious, an abuse of discretion, in excess of statutory limitations, not in accordance with law, without observance of the procedures required by law, and in excess of statutory jurisdiction and authority, in violation of the APA.

## THIRD CLAIM FOR RELIEF
### (Violation of the APA – The Rule is Arbitrary and Capricious)

129.    The State realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

130.    Under the APA, a final agency action may be held unlawful and set aside if

it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706(2)(A).

131.    A regulation is arbitrary and capricious under the APA where:

[T]he agency has relied on factors which Congress has not intended it to
consider, entirely failed to consider an important aspect of the problem,
offered an explanation for its decision that runs counter to the evidence
before the agency, or is so implausible that that it could not be ascribed to a
difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

132.    Furthermore, "[w]hen an agency changes its position, it must (1) 'display[ ]

awareness that it is changing position,' (2) show 'the new policy is permissible under the

statute,' (3) 'believe[ ]' the new policy is better, and (4) provide 'good reasons' for the

new policy." *Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1067 (9th Cir.

2021) (quoting *Org. Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir.

2015); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009).

133.    The Rule is arbitrary and capricious under the APA in numerous ways.

134.    BLM arbitrarily relied on FLPMA's direction that BLM prevent

unnecessary or undue degradation to the public lands to override the clear management

direction in the Production Act. *See* 89 Fed. Reg. at 38,716 (citing 43 U.S.C. § 1732(b)).

Because FLPMA excludes lands that have "been dedicated to specific uses according to

any other provisions of law," *see* 43 U.S.C. § 1732(a), this direction does not apply to the

Petroleum Reserve.

135.    The Rule arbitrarily codifies the Colville Special Area, even though BLM recommended removing the Colville Special Area in the 2020 IAP/EIS.

136.    For these reasons and the reasons set forth in the State's and public's comments on the Proposed Rule, the Rule is arbitrary, capricious, an abuse of discretion, in excess of statutory limitations, not in accordance with law, without observance of the procedures required by law, contrary to constitutional right or privilege, and in excess of statutory jurisdiction and authority, in violation of the APA. Accordingly, the Rule should be vacated in its entirety.

## FOURTH CLAIM FOR RELIEF
### (Violation of APA – Failure to Provide Adequate Notice and Opportunity for Public Comment)

137.    The State realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

138.    BLM failed to provide adequate opportunity for public comment on the Proposed Rule as required by the APA and Executive Order 12,866.

139.    The 90-day public comment period, stitched together through a series of extensions, is facially inadequate given the Rule's significance and complexity. The fact that the comment period occurred during whaling season and overlapped with the comment period on the Coastal Plain Leasing Draft SEIS effectively compresses the comment period and renders it deficient.

140.    BLM failed to meaningfully involve the State, Alaska Native Corporations, tribes, and affected stakeholders before publishing the Proposed Rule.

141.    The Rule is in violation of the APA and therefore should be vacated in its entirety.

### FIFTH CLAIM FOR RELIEF
**(Violation of NEPA and APA)**

142.    The State realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

143.    BLM improperly applied the categorical exclusion under 43 C.F.R. § 46.210(i). The Rule does not fall within this categorical exclusion because it is not "of an administrative, financial, legal, technical, or procedural nature.'"

144.    Additionally, BLM was precluded from applying the categorical exclusion at 43 C.F.R. § 46.210(i) because multiple extraordinary circumstances exist, as identified in 43 C.F.R. § 46.215. Specifically, the Rule will:

   a) "Have significant impacts on public health or safety," 43 C.F.R.
      § 46.215(a);

   b) "Have a disproportionately high and adverse effect on low income or
      minority populations (EO 12898)," *id.* § 46.215(j);

   c) [H]ave "significant impacts on such natural resources and unique
      geographic characteristics" as "historic or cultural resources," "migratory
      birds," and "ecologically significant or critical areas," *id.* § 46.215(b);

   d) "Have significant impacts on species listed, or proposed to be listed, on the
      List of Endangered or Threatened Species or have significant impacts on
      designated Critical Habitat for these species," *id.* § 46.215(h);

e) "Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects, " *id.* § 46.215(e); and

f) "[I]nvolv[e] unresolved conflicts concerning alternative uses of available resources," *Id.* § 46.215(c).

145.    BLM failed to prepare an EIS or EA as required by NEPA.

146.    For these reasons and the reasons set forth in the State's and public's comments on the Proposed Rule, the Rule violates NEPA and is arbitrary, capricious, an abuse of discretion, in excess of statutory limitations, not in accordance with law, without observance of the procedures required by law, and in excess of statutory jurisdiction and authority, in violation of the APA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court.

1.    Declare and vacate the Rule as arbitrary, capricious, an abuse of discretion, in excess of statutory limitations, not in accordance with law, without observance of the procedures required by law, and in excess of statutory jurisdiction and authority;

2.    Enjoin the Defendants from taking any action to implement or that relies on the Rule;

3.    Grant the State its costs, expenses, and attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

4.    Grant the State such further relief as this Court deems appropriate.

DATED: July 3, 2024.

TREG TAYLOR
ATTORNEY GENERAL

By:  /s/   Ronald W. Opsahl
Ronald W. Opsahl (Alaska Bar No. 2108081)
Ryan E. Farnsworth (Alaska Bar No. 2305047)
Assistant Attorney General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 279-2834
Email: ron.opsahl@alaska.gov
        ryan.farnsworth@alaska.gov

By:  /s/   Kathleen C. Schroder
Kathleen C. Schroder (*pro hac vice* pending)
Mark E. Champoux (*pro hac vice* pending)
Davis Graham & Stubbs LLP
1550 Seventeenth St., Suite 500
Denver, CO 80202
Telephone: (303) 892-9400
Fax: (303) 893-1379
Email: katie.schroder@davisgraham.com
        mark.champoux@davisgraham.com

*Attorneys for the State of Alaska*