Paul D. Clement, VA Bar #37915
    (admitted pro hac vice)
Andrew C. Lawrence, VA Bar #99830
    (admitted pro hac vice)
Kevin Wynosky*, PA Bar #326087
    (admitted pro hac vice)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
andrew.lawrence@clementmurphy.com
kevin.wynosky@clementmurphy.com

*Supervised by principals of the firm who are
  members of the Virginia bar

*Counsel for Intervenor-Plaintiff Alaska Oil and Gas Association*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| & | ) |
| | ) |
| ALASKA OIL AND GAS ASSOCIATION, | ) |
| | ) |
| *Intervenor-Plaintiff,* | ) No. 3:24-cv-144-SLG |
| | ) |
| v. | ) |
| | ) |
| BUREAU OF LAND MANAGEMENT; | ) |
| UNITED STATES DEPARTMENT OF THE | ) |
| INTERIOR; DEBRA HAALAND, in her | ) |
| official capacity as the United States | ) |
| Secretary of the Interior, | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

## COMPLAINT IN INTERVENTION
## (5 U.S.C. §§701-706)

## PRELIMINARY STATEMENT

1.      In just the past few weeks, the Supreme Court has made two principles of administrative law abundantly clear. First, in cases involving the Administrative Procedure Act (APA), "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," without deferring to the agency's interpretation. *Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244, 2273 (2024) (overruling *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). Second, an agency violates the APA's arbitrary-and-capricious standard if it "offer[s] no reasoned response" to significant concerns "posed … during the notice and comment period." *Ohio v. EPA*, 144 S.Ct. 2040, 2054 (2024). Those principles doom the administrative rule at issue in this case. Here, the Department of Interior's Bureau of Land Management (BLM) issued an unprecedented rule that seeks to severely restrict petroleum production in the National Petroleum Reserve in Alaska (NPR-A) pursuant to a statute—the Naval Petroleum Reserves Production Act (Production Act)—that demands nearly the opposite, as the statute's very title indicates. And BLM did so without meaningfully engaging with comments pointing out the numerous flaws with that approach. As long as that profoundly unlawful rule (NPR-A Rule) remains on the books, it will seriously harm the interests of Alaska's private oil-and-gas industry. This Court should set the NPR-A Rule aside.

2.      The NPR-A spans approximately 23 million acres on Alaska's North Slope and is the Nation's single largest block of public land. President Harding originally set

2

*Alaska v. Bureau of Land Management*, No. 3:24-cv-144-SLG
Case 3:24-cv-00144-SLG   Document 19   Filed 09/04/24   Page 2 of 32

aside the NPR-A in 1923 to ensure that the then-coal-powered U.S. Navy would have ready reserves of energy as it pivoted towards petroleum-based fuel. But in 1980, reeling from the gas shortages and other effects of the 1979 oil crisis, Congress amended the Production Act (which it originally enacted in 1976), directed BLM to enlist the private oil-and-gas industry's support for petroleum production in the NPR-A, and ordered BLM to "conduct an expeditious program of competitive leasing of oil and gas" on the land. 42 U.S.C. §6506a(a).

3. In enacting the Production Act, Congress recognized that the NPR-A is generally rich in "surface resources" like wildlife. *Id.* §6506a(b). But as one might expect from a statute that endeavored to quickly counteract a major energy crisis, the Production Act ultimately established a paramount goal of "open[ing] the NPR-A to private leasing and exploration and production in order to increase domestic oil supply as expeditiously as possible." *ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n*, 660 F.Supp.3d 822, 834 (D. Alaska 2023) (Gleason, J.). Consistent with that goal, the Production Act expressly carves out the NPR-A from the environmental protections of the Wilderness Act, which is a statute that addresses whether lands should remain preserved as wilderness. *See* 42 U.S.C. §6506a(c); *see also* 43 U.S.C. §1782(a)-(b). The Production Act also exempts the NPR-A from the multiple-use, sustained-yield mandates of the Federal Land Policy and Management Act (FLPMA), *see* 42 U.S.C. §6506a(c); *see also* 43 U.S.C. §1712, underscoring that the Production Act is a dominant-use statute that prioritizes petroleum production. And while the Production Act gives BLM authority to mitigate the impact of oil-and-gas activities on the environment—*i.e.*, to "include or

3

provide for such conditions, restrictions, and prohibitions … necessary or appropriate to mitigate … effects on the surface resources of" the NPR-A—BLM may exercise that authority only when oil-and-gas "[a]ctivities" are in fact "undertaken," which is language that of course presupposes that such activities will indeed occur, even if certain aspects of those activities may require modification. 42 U.S.C. §6506a(b). Even then, however, BLM can impose modifications only when the "effects on the surface resources" are "reasonably foreseeable and significantly adverse," *id.*, thereby precluding BLM from impeding petroleum production based on concerns rooted in uncertainty or speculation.

4. The Production Act likewise recognizes that oil-and-gas exploration may occur within certain pockets of the NPR-A that contain especially "significant subsistence, recreational, fish and wildlife, or historical or scenic values." 42 U.S.C. §6504(a). But even as to these unique areas—known as "Special Areas"—the Production Act states that private enterprise may nevertheless "conduct[]" exploration and simply asks BLM to "assure the maximum protection of such surface values" while that exploration activity occurs, provided that such mitigation efforts are "consistent with the requirements of [the Production Act] for the exploration of the reserve." 42 U.S.C. §6504(a). As BLM thus contemporaneously explained in 1977, the "[m]aximum protection" directive "does *not* imply a prohibition of exploration or other activities," as that directive must remain "consistent with the requirements of the [Production Act]," which affirmatively contemplates that exploration and other activities will proceed apace. 42 Fed. Reg. 28,723, 28,723 (1977) (emphasis added).

5. To implement the Production Act's clear command that it must facilitate

petroleum exploration and production, BLM for decades has held lease sales in which private oil-and-gas companies obtained substantial acreage in the NPR-A for exploration and production purposes. Members of the Alaska Oil and Gas Association (AOGA)—a trade association that acts as the voice of Alaska's private oil-and-gas industry (and which is intervenor-plaintiff here)—have played a central role in that process, as members have acquired hundreds of leases spanning hundreds of thousands of acres in the NPR-A. AOGA members have also spent billions of dollars developing the land to date to ensure that oil and gas is produced, as Congress obviously desired. *See, e.g.*, 126 Cong. Rec. 29489 (1980) (statement of Sen. Stevens) ("[W]e can no longer delay efforts which would increase the domestic supply of oil and lessen our reliance on imports."). And AOGA members intend to participate as bidders in any future lease sales.

6.      Last year, however, BLM reversed course in defiance of the Production Act's plain text and issued a proposed rule reflecting its newfound conclusion that the Production Act in fact authorizes it to set aside over half—and maybe much more—of the NPR-A as de facto wilderness area (*i.e.*, the Special Areas) while also severely restricting further oil-and-gas activity elsewhere in the NPR-A. *See* 88 Fed. Reg. 62,025 (Sept. 8, 2023). Unsurprisingly, that proposed rule generated thousands of critical comments during the (abbreviated and ill-timed) notice-and-comment period—including from AOGA, which explained how BLM had overstepped and how its proposed rule would negatively affect its members' interests. But BLM forged ahead nonetheless and issued the final rule at issue here with virtually no changes. *See* 89 Fed. Reg. 38,712 (May 7, 2024).

7.      The NPR-A Rule stands the Production Act on its head. Among other things,

*Alaska v. Bureau of Land Management*, No. 3:24-cv-144-SLG

BLM asserts sweeping authority across the entire NPR-A to "protect surface resources by adopting whatever conditions, restrictions, and prohibitions it deems necessary or appropriate"—even if that means "denying some or all aspects of proposed oil and gas activities"—and to "ensure that any conditions, restrictions, or prohibitions on proposed oil and gas activities account for and reflect" "uncertainty concerning … potential effects on surface resources," even if those potential and uncertain effects are not reasonably foreseeable. *Id.* at 38,721, 38,757.

8.       Furthermore, in the Special Areas comprising over half of the entire NPR-A—or, as the Secretary of Interior put it, areas that are "too special to develop," Press Release, U.S. Dep't of the Interior, *Biden-Harris Administration Takes Critical Action to Protect Alaska Native Subsistence, Lands and Wildlife* (Apr. 19, 2024), https://on.doi.gov/4cTPbbv—BLM has imposed a new "management priority" of "maximum protection of significant resource values" with respect to all oil-and-gas activities, even though the Production Act imposes a maximum-protection directive only with respect to exploration activities in the Special Areas. 89 Fed. Reg. at 38,759. Under that new regime in the Special Areas, BLM claims authority to "*presume* that proposed oil and gas activities" will "adverse[ly] effect[]" surface resources and to block "proposed oil and gas activities" unless "specific information … clearly demonstrates that th[e] activities can be conducted with no or minimal adverse effects." 89 Fed. Reg. at 38,759 (emphasis added). If oil producers already made significant financial commitments to lease land in these Special Areas, that is just too bad:   BLM will "approve" "new permanent infrastructure" "only if" it thinks that "such infrastructure is necessary to comport with the

terms of a valid existing lease," and BLM reserves the power to "condition[], delay[] action

on, or deny[] proposals" for new uses of the land "either in whole or in part," including by

requiring the producer to undertake "compensatory mitigation" in another area altogether.

89 Fed. Reg. at 38,759-60.

9.     BLM has also given itself *carte blanche* to expand the Special Areas at its

discretion to include any areas with surface values that it "identifies as significant."  89

Fed. Reg. at 38,723; *see id.* at 38,739 (explaining that, "[u]ltimately," Special Area

designations "will be at the discretion of the BLM").  Making matters worse, BLM's ability

to designate areas as "special" is a one-way ratchet, as the NPR-A Rule cabins future

policymakers' discretion to de-designate land and imposes onerous procedural

requirements to do so.  *See id.* at 38,759.

10.     The net effect is that BLM has taken a statute mandating that the agency

facilitate the exploration and production of petroleum in the NPR-A as quickly as possible

and has transformed it into a statute under which petroleum production development is

presumptively forbidden and otherwise subject to BLM's caprice.  That is a textbook

example of *ultra vires* action—and one that squarely implicates the "major questions"

doctrine, which requires agencies to show that they have "clear" authority to regulate when

questions of great "economic and political significance" are implicated.  *West Virginia v.

EPA*, 597 U.S. 697, 721, 723-24 (2022).  There are few questions more major than the

federal government's policy toward the Nation's largest block of public land—one teeming

with approximately 9 billion barrels of oil and 25 trillion cubic feet of natural gas—and the

agency's newfound authority to pursue ends nearly the opposite of Congress' original

design raises concerns that are central to that doctrine.

11.    And the problems run much deeper.  The NPR-A Rule is impossible to square with BLM's contemporaneous and longstanding interpretation of the Production Act, and the agency has offered no reasoned explanation for that regulatory about-face.  BLM also "sidestep[ped]" numerous other concerns raised during the notice-and-comment period even though the APA demands that an agency actually "offer[] 'a satisfactory explanation for its action.'"  *Ohio*, 144 S.Ct. at 2053, 2055.  And on top of all that, BLM failed to comply with the environmental-review requirements set forth in the National Environmental Policy Act (NEPA) and the agency's own implementing regulations.

12.    The end result is a rule that is unlawful several times over.  And the stakes here are high, as the rule is poised to inflict significant harm on Alaska's private oil-and-gas industry and those who depend on it.  This Court should not allow that disaster to happen.  Instead, the Court should set the rule aside and permanently enjoin its enforcement.

## THE PARTIES

13.    Intervenor-plaintiff AOGA is a nonprofit trade association located in Anchorage, Alaska, and is comprised of 17 private oil-and-gas companies.  Together, AOGA's members account for most of the oil-and-gas exploration, development, production, transportation, refining, and marketing activities in Alaska.  The majority of these activities take place on Alaska's North Slope, and a signification portion occur on NPR-A land leased from the federal government, including on land lying within the Special Areas.

8

*Alaska v. Bureau of Land Management*, No. 3:24-cv-144-SLG
Case 3:24-cv-00144-SLG   Document 19   Filed 09/04/24   Page 8 of 32

14.     AOGA and its members are committed to promoting safe and sustainable operations within NPR-A.  Among other things, the U.S. Fish & Wildlife Service praised AOGA members' efforts to develop and adopt best-practices for conserving the region's polar bear population and mitigating impact to the caribou population.  *See, e.g.*, 73 Fed. Reg. 28,306, 28,314 (May 15, 2008); 73 Fed. Reg. 28,212, 28,266 (May 15, 2008).  AOGA members have also sought to employ the latest drilling technology—including utilizing multilateral or sidetracked wells—to efficiently produce oil and gas with minimal geographic footprint.

15.     AOGA members have participated as bidders in past NPR-A lease sales and plan to participate as bidders in future sales.  On behalf of its members, AOGA has a strong interest in advocating for BLM to continue conducting lease sales consistent with Congress' command to "conduct an expeditious program of competitive leasing of oil and gas" on NPR-A.  42 U.S.C. §6506a(a).

16.     During the notice-and-comment process preceding the issuance of the NPR-A Rule, AOGA submitted comments, which are attached as Exhibit A and adopted by reference here.

17.     Defendant the Department of the Interior is a federal, cabinet-level agency responsible for overseeing public lands.

18.     Defendant BLM is an agency within the Department of the Interior responsible for managing the NPR-A.  BLM promulgated the rule at issue.

19.     Defendant Debra Haaland is the Secretary of the Interior.  She is sued in her official capacity only.

9

*Alaska v. Bureau of Land Management*, No. 3:24-cv-144-SLG
Case 3:24-cv-00144-SLG   Document 19   Filed 09/04/24   Page 9 of 32

20.    AOGA's causes of action arise under the APA.  *See* 5 U.S.C. §§702, 705, 706. This Court has jurisdiction under 28 U.S.C. §1331.

21.    Venue is proper in this district under 28 U.S.C. §1391(e)(1)(B).

## BACKGROUND

### A.    Historical & Statutory Background

22.    Interest in what lies beneath what is now the NPR-A has existed for centuries. In the 1800s, Yankee whalers sailing off Alaska's North Slope first realized the region's prodigious petroleum reserves when they observed oil pools forming on the tundra surface. *See* Peter Canby, *The Specter Haunting Alaska*, N.Y. Rev. (Nov. 15, 2005), https://bit.ly/4eU4JOl.  In 1923, President Harding signed Executive Order 3797-A, which defined areas of "large seepages of petroleum along the Arctic Coast of Alaska" and "sought to retain federal ownership" of these "valuable petroleum fields" to "secur[e] a supply of oil for the Navy," which at the time had just started to transition away from coal power.  *United States v. Alaska*, 521 U.S. 1, 39 (1997); *see* Canby, *supra*.  Although the Texas oil boom quickly shifted production primacy to the "gushers" of Texas and Oklahoma, *see* Canby, *supra*, the land then known as "Naval Petroleum Reserve No. 4" remained on "standby" for "national defense," alongside other strategic reserves in California and (infamously) in Teapot Dome, Wyoming, *see* Comptroller General of the United States, *Capability of the Naval Petroleum and Oil Shale Reserves to Meet Emergency Oil Needs* 1, 6-8 (Oct. 5, 1972), https://bit.ly/3WfF4bH.

23.    By the 1970s, America faced growing demands for petroleum but an

10

*Alaska v. Bureau of Land Management*, No. 3:24-cv-144-SLG
Case 3:24-cv-00144-SLG   Document 19   Filed 09/04/24   Page 10 of 32

increasingly volatile import trade—volatility that reached its nadir when Arab nations retaliated against American support for Israel with an oil embargo following the 1973 Arab-Israeli War. *See* Dep't of State, *Oil Embargo, 1973-1974*, https://bit.ly/3zzcl8J (last visited Sept. 4, 2024). Thus, Congress passed the Production Act, which directed the Department of Energy to drill on the California and Wyoming reserves and sell the resulting oil at market rates. Congress' choice not only promoted energy independence, but also provided the U.S. Treasury with a valuable source of revenue for decades until the full privatization of the California and Wyoming reserves. *See* Dep't of Energy, *About NPR*, https://bit.ly/4cGwSHq (last visited Sept. 4, 2024).

24.    But Congress did not initially authorize drilling on Naval Petroleum Reserve No. 4. Instead, the Production Act—which redesignated the land as the NPR-A—transferred jurisdiction from the Secretary of the Navy to the Secretary of the Interior and allowed Interior itself to explore for petroleum, but "prohibited" "production of petroleum" as well as "development leading to production of petroleum … until authorized by an Act of Congress." Pub. L. No. 94-258, §§102-104, 90 Stat. 303, 303-04 (1976); *see also id.* §104(e), 90 Stat. at 305 (creating a limited exception allowing continued operation of the South Barrow gas field). The Production Act also stated that the Secretary "may"—but is not required to—"promulgate such rules and regulations as he deems necessary" "to the protection of environmental, fish and wildlife, and historical or scenic values" "within the reserve." *Id.* §103(b), 90 Stat. at 303-04 (codified at 42 U.S.C. §6503(b)).

25.    By its nature, petroleum exploration is an uncertain endeavor. So, the Production Act included mechanisms to ensure that potentially fruitless exploration would

*Alaska v. Bureau of Land Management*, No. 3:24-cv-144-SLG

not permanently scar areas with "significant subsistence, recreational, fish and wildlife, or historical or scenic value"—*i.e.*, the Special Areas. *Id.* §104(b)-(d), 90 Stat. at 304-05 (codified at 42 U.S.C. §6504(a)). In particular, Congress required that "[a]ny exploration within the Utukok River, the Teshekpuk Lake areas, and other areas designated by the Secretary of the Interior containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value, shall be conducted in a manner which will assure the maximum protection of such surface values." *Id.* (codified at 42 U.S.C. §6504(a)). The Secretary subsequently exercised this discretion to also protect the Colville River, Kasegaluk Lagoon, and Peard Bay areas from overly intrusive exploration. *See* 89 Fed. Reg. at 38,715-16. A map depicting those Special Areas is reproduced below:



*See* https://tinyurl.com/yck7vevu.

26. In 1977, contemporaneously with the enactment of the Production Act, BLM issued a rule defining what it means to provide "maximum protection" in the Special Areas. Specifically, BLM stated that maximum protection "includ[es]" "requirements" like "(1) rescheduling activities and use of alternative routes, (2) types of vehicles and loadings, (3) limiting types of aircraft in combination with minimum flight altitudes and distances from identified places and (4) special fuel handling procedures." 42 Fed. Reg. 28,720, 28,722 (1977). But the 1977 rule went out of its way to say that "[m]aximum protection of designated special areas does *not* imply a prohibition of exploration or other activities." *Id.* at 28,723 (emphasis added). Rather, the 1977 rule took the position "that continuation of oil and gas exploration is a requirement of" the Production Act. *Id.* at 28,720.

27. Congress' approach to the NPR-A changed again in 1980. Spurred into action by another oil crisis—this time following the 1979 Iranian revolution—Congress amended the Production Act to "direct[] the Secretary of the Interior to open the NPR-A to private exploration and establish 'an expeditious program of competitive leasing of oil and gas in the' NPR-A." *ConocoPhillips*, 660 F.Supp.3d at 826, 834 (quoting 42 U.S.C. §6506a(a)); *see also N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 973 (9th Cir. 2006). While the Production Act also stated that "[a]ctivities undertaken pursuant to this Act shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the National Petroleum Reserve in Alaska," that language presupposed that private industry would indeed "undertake[]" oil-and-gas activities and that the NPR-A would not sit undeveloped as a nature preserve. 42 U.S.C.

13

§6506a(b).

28.    For over four decades, BLM has consistently held lease sales in the NPR-A to ensure that it is in compliance with Congress' desire to spur petroleum production in the NPR-A.

29.    Those lease sales started in the 1980s, and in the 21st century alone, BLM has held lease sales in 15 different years.

30.    AOGA members currently hold hundreds of those leases, which collectively span hundreds of thousands of acres, including in the Special Areas.  Those members intend to participate in future lease sales as well.  Other AOGA members have business models that are directly connected to production in the NPR-A (*e.g.*, pipeline operators).

**B.    The Challenged BLM Rule**

31.    When President Biden took office in 2020, BLM abruptly ceased holding lease sales in the NPR-A.

32.    Instead, on September 8, 2023, BLM issued a proposed rule to "revise the management framework for surface resources throughout the NPR-A and Special Areas in the NPR-A" for the first time since 1977.  88 Fed. Reg. at 62,026.

33.    AOGA submitted comments in opposition to the proposed rule, *see* Ex.A, as did numerous other stakeholders.

34.    On April 19, 2024—the day before Earth Day—BLM publicly announced that it had completed the final NPR-A Rule, which it published in the Federal Register on May 7, 2024, making virtually no changes as compared to the proposed rule, *see* 89 Fed. Reg. 38,712.

*Alaska v. Bureau of Land Management*, No. 3:24-cv-144-SLG

35.     The effect of the NPR-A Rule is nothing short of extraordinary. Among other things, the NPR-A Rule revises 43 C.F.R. Part 2360 to include §2361.10. That section, which applies across the entire NPR-A, compels BLM to "protect surface resources by adopting whatever conditions, restrictions, and prohibitions it deems necessary or appropriate," including "conditioning, delaying action on, or denying some or all aspects of proposed oil and gas activities." *Id.* at 38,757. That section also states that BLM "shall ensure that any conditions, restrictions, or prohibitions on proposed oil and gas activities account for and reflect" "any uncertainty concerning the nature, scope, and duration of potential effects on surface resources" in the NPR-A. *Id.*

36.     The NPR-A Rule also revises 43 C.F.R. Part 2360 to include §2361.30, which gives BLM authority to designate as "Special Areas" all those "areas within the Reserve identified by the Secretary or by statute as having significant resource values." *Id.* at 38,757-59. The rule in turn circularly defines "[s]ignificant resource value" as "any surface value, including subsistence, recreational, fish and wildlife, historical, scenic, or other surface value that the Bureau identifies as significant and supports the designation of a Special Area." *Id.* at 38,757.

37.     Section 2361.30 requires BLM to consider, at least once every 10 years, whether to designate new Special Areas, expand existing ones, or recognize new significant resource values in them. *See id.* at 38,758.

38.     When BLM "designates lands as Special Areas or recognizes the presence of additional significant resource values in existing Special Areas," BLM "must adopt measures to assure maximum protection of significant resource values." And §2361.30

15

*Alaska v. Bureau of Land Management*, No. 3:24-cv-144-SLG
Case 3:24-cv-00144-SLG   Document 19   Filed 09/04/24   Page 15 of 32

also allows BLM to impose "interim measures" to "assure maximum protection of significant resource values in lands under consideration for designation as a new or modified Special Area." *Id.* at 38,759.

39.    On the flipside, §2361.30 purports to cabin discretion for future policymakers to de-designate Special Areas.  For example, §2361.30 states that BLM "may not remove lands from the Teshekpuk Lake and Utukok River uplands Special Areas unless directed to do so by statute."  Moreover, §2361.30 provides that future policymakers can de-designate Special Areas (other than the Teshekpuk Lake and Utukok River Uplands areas) "only when all of the significant resource values that support the designation are no longer present."  To de-designate Special Areas, future policymakers must "(1) [p]repare a summary of its proposed determination, including the underlying factual findings; (2) [p]rovide the public and interested stakeholders with the opportunity to review and comment on the proposed determination; and (3) [i]ssue a determination that documents how the views and information provided by the public, federally recognized Tribes, Alaska Native Claims Settlement Act corporations, federally qualified subsistence users, and other interested stakeholders have been considered."  *Id.*

40.    The NPR-A Rule further revises 43 C.F.R. Part 2360 to include §2361.40, which governs the management of oil-and-gas activities in the Special Areas.  That section establishes a new "management priority" for all proposed oil-and-gas activities in the Special Areas—namely, "to assure maximum protection of significant resource value."  To implement that management priority, §2361.40 asserts a general power under which BLM may "condition[], delay[] action on, or deny[] proposals for activities, either in whole or in

part," "to avoid the adverse effects of proposed oil and gas activities," while also announcing a "presum[ption] that proposed oil and gas activities should not be permitted unless specific information available to" BLM "clearly demonstrates that those activities can be conducted with no or minimal adverse effects on significant resource values or unless they are necessary to comport with the terms of a valid existing lease." Section 2361.40 also declares that BLM will not "approve new permanent infrastructure related to existing oil and gas leases" unless "such infrastructure is necessary to comport with the terms of a valid existing lease." And §2361.40 also gives BLM the authority to require entities to undertake "compensatory mitigation" "measures" in response to approved activities within the Special Areas. 89 Fed. Reg. at 38,759.

41.     Finally, BLM concluded that the NPR-A Rule need not comply with the environmental-review requirements set forth in NEPA and its own implementing regulations and that the rule instead qualifies for a "categorical exclusion" to NEPA's requirements for two reasons. First, in BLM's view, the rule "fits within the categorical exclusion for rules, regulations, or policies" that "establish bureau-wide administrative procedures, program processes, or instructions." Second, BLM continued, none of the "circumstances identified at 43 CFR 46.215" that would override that categorical exclusion "apply." *Id.* at 38,755.

42.     As soon as BLM made the NPR-A Rule public, President Biden publicly gave away the game by boasting that "my administration" had just "conserve[d] more than 13 million acres in the Western Arctic," while vowing that it "will continue to take ambitious action to meet the urgency of the climate crisis, protect America's lands and

waters, and fulfill our responsibility to the next generation of Americans." Press Release, White House, *Statement From President Joe Biden on Protecting Alaska's Arctic Lands, Waters, and Wildlife* (Apr. 19, 2024), https://tinyurl.com/yc4azvzd.

## CLAIMS FOR RELIEF

### COUNT ONE
### APA
### Agency Action Not In Accordance With Law &
### In Excess Of Statutory Limitations

43.     AOGA re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

44.     The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory … limitations." 5 U.S.C §706(2)(A), (C).

45.     As the Supreme Court recently confirmed, when determining whether an agency action exceeds statutory limits, "[c]ourts must exercise their independent judgment" and "use every tool at their disposal to determine the best reading of the statute." *Loper*, 144 S.Ct. at 2266, 2273.  Although an agency previously may have skated by with just a "permissible" reading of an ambiguous statute that allowed it to advance various "policy preferences that had not made it into" the text, *Chevron*'s *ancien régime* is over. *Id.* at 2266, 2268.  "In the business of statutory interpretation, if it is not the best, it is not permissible."  *Id.* at 2266.  Here, BLM's interpretation of the relevant statutes is not close to the best.

46.     BLM's assertion of authority is breathtaking.  Among other things, BLM

18

*Alaska v. Bureau of Land Management*, No. 3:24-cv-144-SLG

Case 3:24-cv-00144-SLG   Document 19   Filed 09/04/24   Page 18 of 32

claims that, *anywhere* throughout NPR-A, it can "condition[], restrict[], or prohibit[] …
some or all aspects of" any "proposed oil and gas activities," including based on
"uncertainty concerning the nature, scope, and duration of potential effects on surface
resources." 89 Fed. Reg. at 38,721, 38,757.

47.     BLM also claims that it is authorized to designate *anywhere* in NPR-A—all
23 million acres—a "Special Area" if it identifies "any … surface value that [BLM]
identifies as significant," and more than half of the NPR-A is already so identified. *Id.* at
38,757. After BLM makes those designations, it will "presume that proposed oil and gas
activities" will "adverse[ly] effect[]" surface resources and thus will flatly prohibit all
"proposed oil and gas activities" and "permanent infrastructure" unless either "specific
information … clearly demonstrates that th[e] activities can be conducted with no or
minimal adverse effects" or "such infrastructure is necessary to comport with the terms of
a valid existing lease." *Id.* at 38,759. BLM also claims the power to require a leaseholder
to undertake "compensatory mitigation" measures somewhere else. *Id.* at 38,760. All this
reflects a new "management priority within Special Areas," which "is to assure maximum
protection of significant resource values." *Id.* at 38,759.

48.     The problems with BLM's interpretation of the Production Act are legion.
For starters, BLM's conception of its own authority renders Congress' basic command to
"conduct an expeditious program of competitive leasing of oil and gas" essentially
toothless, in violation of basic statutory-construction principles. 42 U.S.C. §6506a(a). *But
see Azarte v. Ashcroft*, 394 F.3d 1278, 1288 (9th Cir. 2005) ("[A]ll provisions and other
features of the enactment must be given force, and provisions must be interpreted so as not

to derogate from the force of other provisions and features of the whole statute.").  After all, the entire point of that provision (and the Production Act more generally) is to encourage petroleum production, not impede it. *See Sovereign Iñupiat for a Living Arctic v. BLM*, 2023 WL 7410730, at *7 (D. Alaska Nov. 9, 2023) (Gleason, J.) (noting that prohibitions or restrictions that "would leave considerable quantities of economically recoverable oil in the ground is quite simply inconsistent with the Congressional policy objective of resource extraction in the NPR-A").  Indeed, the Production Act specifically says that leases will "expire" "if no oil or gas is produced from a lease" within a certain amount of time.  42 U.S.C. §6506a(i)(5).  To nevertheless conclude that the Production Act is a tool to "conserve[]" "natural wonders" and to keep petroleum in the ground, White House Press Release, *supra*, thus gets matters exactly backwards.

49.    Similarly, even though Congress expressly *exempted* the NPR-A from the protections of the Wilderness Act in order to further the "expeditious program of competitive leasing," *see* 42 U.S.C. §6506a(a), (c), BLM now contends that Congress obliquely provided an even *more* straightforward path to declare the millions of acres within the NPR-A a de facto wilderness area, *cf.* 43 U.S.C. §1782(b) (requiring the President to submit proposed wilderness designations to Congress for ratification).  *But see Quarles v. United States,* 587 U.S. 645, 654 (2019) ("We should not lightly conclude that Congress enacted a self-defeating statute.").  There is no way that is the best interpretation of the Production Act.

50.    In reality, the Production Act is a statute that Congress enacted in response to one of the most pressing issues of the time in the late 1970s and early 1980s—an

20

*Alaska v. Bureau of Land Management*, No. 3:24-cv-144-SLG
Case 3:24-cv-00144-SLG   Document 19   Filed 09/04/24   Page 20 of 32

unprecedented oil shock caused by foreign events—and it responded by indefinitely opening up the largest block of public land to private oil-and-gas activities. The administration of the NPR-A thus is an issue of great "economic and political significance." *West Virginia*, 597 U.S. at 721. Accordingly, any "decision" to stymie oil-and-gas activity in the NPR-A is one "of such magnitude and consequence" that it "rests with Congress itself, or an agency acting pursuant to a *clear* delegation from that representative body." *Id.* at 735 (emphasis added); *contra* 89 Fed. Reg. at 38,749 ("BLM's economic analysis concludes that most of the provisions of the final rule are editorial, administrative, or otherwise could have no quantifiable economic cost or benefit."). There is no such delegation to BLM in the Production Act or any other statute.

51. BLM nevertheless attempts to draw support for its expansive assertion of authority in five different statutory provisions, *see* 89 Fed. Reg. at 38,716-17, but none comes close to supplying it.

52. First, BLM calls up 42 U.S.C. §6503(b). *See id.* That general provision, part of the original 1976 version of the Production Act authorizing exploration but not drilling in the NPR-A, authorizes—but does not require—"the Secretary of the Interior [to] promulgate such rules and regulations as [s]he deems necessary and appropriate for the protection of" "environmental, fish and wildlife, and historical or scenic values" "within the reserve." Contrary to BLM's apparent understanding, that provision is not limitless. Even when Congress delegates "a degree of discretion" to an agency via terms like "necessary" and "appropriate," it still falls to courts to "fix[] the boundaries of the delegated authority" and to ensure that agencies are not overstepping. *Loper*, 144 S.Ct. at

21

*Alaska v. Bureau of Land Management*, No. 3:24-cv-144-SLG
Case 3:24-cv-00144-SLG   Document 19   Filed 09/04/24   Page 21 of 32

2263.  It is neither necessary nor appropriate to give effect to a statute titled the *Production*

*Act* by promulgating a rule that outright prohibits or severely curtails petroleum production

from those reserves.  *See, e.g.*, *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554

U.S. 33, 47 (2008) ("[S]tatutory titles … are tools available for the resolution of a doubt

about the meaning of a statute.").  Such a reading would render the Production Act self-

defeating.  *But see, e.g.*, *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 20 (1995) ("It is an

elementary rule of construction that 'the act cannot be held to destroy itself.'").

    53.    Second, BLM pivots to 42 U.S.C. §6506a(b) itself.  *See* 89 Fed. Reg. at

38,716.  In the same breath that Congress called for "an expeditious program of competitive

leasing of oil and gas in … accordance with [the Production Act]," 42 U.S.C. §6506a(a),

Congress also gave BLM authority to "include or provide for such conditions[] … as [it]

deems necessary or appropriate to mitigate reasonably foreseeable and significantly

adverse effects on the surface resources of" NPR-A, *id.* §6506a(b).  One cannot reasonably

interpret the latter clause as authorization to deny or impede oil-and-gas activities, least of

all based on "uncertainty concerning the nature, scope, and duration of potential effects on

surface resources," which is the authority that BLM claims here.  Indeed, §6506a(b)

authorizes BLM to engage in mitigation only when oil-and-gas "activities" are actually

"undertaken"—*i.e.*, the statute operates on the understanding that such activities *will* occur

and simply asks that BLM minimize the impact of those undertaken activities.  And to state

the obvious, something that is "uncertain" or merely a "potential" possibility is not

remotely close to qualifying as "reasonably foreseeable."  Ultimately, if Congress wanted

to empower BLM to restrict oil-and-gas activity based on uncertainty, it would have said

so explicitly (presumably in a statute with a very different title). *See Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 599 (D.C. Cir. 2023) ("[W]hen the Congress wants an agency to apply a precautionary principle, it says so."). The Production Act does no such thing.

54.     Third, BLM shifts to 42 U.S.C. §6504(a), which states that "exploration within the Utukok River, the Teshekpuk Lake areas, and other areas designated by the Secretary of the Interior containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value, shall be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve." *See* 89 Fed. Reg. at 38,715-16. This provision cannot bear the weight that BLM places on it either. Among other things, §6504(a) applies only to petroleum "exploration" in the Special Areas—not to any and all proposed oil-and-gas activity in the Special Areas. Furthermore, in the limited context where §6504(a) applies, it requires petroleum exploration to "be *conducted* in a manner which will assure the maximum protection of such surface values." *Id.* at 38,716. As BLM contemporaneously understood when Congress first enacted the Production Act (and as other contemporaneous evidence confirms), the "[m]aximum protection" language does "*not* imply a prohibition of exploration or other activities." 42 Fed. Reg. at 28,723 (emphasis added). That regulatory "interpretation[,] issued contemporaneously with the statute at issue" and "remain[ing] consistent" for four-and-a-half decades, offers an "especially useful" indicator of "the statute's meaning." *Loper*, 144 S.Ct. at 2262. And that contemporaneous interpretation is correct, as a statute directing petroleum exploration

23

to "be conducted" subject to conditions in specific areas plainly does not confer authority to block or delay any and all petroleum activities—such that they are not conducted—in those specific areas. *See also* H.R. Rep. No. 94-942, at 21 (1976) (Conf. Rep.) (explaining that "'maximum protection of such surface values' is not a prohibition of exploration-related activities within [Special Areas]," but rather conveys that "such exploration operations will be conducted in a manner which will minimize the adverse impact on the environment"); *Nat'l Audubon Soc'y v. Kempthorne*, 2006 WL 8438583, at *15 (D. Alaska Sept. 26, 2006) (same).

55. Fourth, BLM latches onto an FLPMA provision authorizing Interior to, "by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." *See* 89 Fed. Reg. at 38,716 (citing 43 U.S.C. §1732(b)). Even assuming that the FLPMA applies in the NPR-A—and it does not—the cited provision, couched in the highest possible level of generality, could not displace the Production Act's "precisely drawn, detailed" provisions, *Brown v. Gen. Serv. Admin.*, 425 U.S. 820, 834 (1976), which establish a "Congressional policy objective of resource extraction in the NPR-A," *Sovereign Iñupiat for a Living Arctic*, 2023 WL 7410730, at *7. Indeed, BLM's felt need to look beyond the Production Act for statutory authority for its action is powerful evidence that the Production Act confers no such authority.

56. Finally, BLM invokes a provision from the Alaska National Interest Conservation Act (ANILCA) that requires BLM to "evaluate the effect" of proposed activities "on subsistence uses and needs." 89 Fed. Reg. at 38,716-17 (citing 16 U.S.C. §3120(a)). Reliance on that provision is similarly flawed, as the Production Act already

*Alaska v. Bureau of Land Management*, No. 3:24-cv-144-SLG

specifically addresses how BLM should address such "surface values." *See* 42 U.S.C. §§6504(a), 6506a(b). Those specific Production Act provisions therefore govern ANILCA's more general terms, and as already explained, those specific provisions do not authorize BLM to take its action here. *See, e.g.*, *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 524 (1989) ("A general statutory rule usually does not govern unless there is no more specific rule."). If anything, ANILCA affirmatively undermines BLM's assertion of authority, as that statute expressly states that BLM may set aside new "conservation" areas in Alaska larger than 5,000 acres *only* with express congressional approval. *See* 16 U.S.C. §3213.

57. All roads thus lead to the conclusion that the NPR-A Rule is *ultra vires*, as demonstrated above and as explained during the notice-and-comment period. This Court should set the rule aside.

## COUNT TWO
### APA
### Arbitrary and Capricious Agency Action

58. AOGA re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

59. The APA "requires agencies to engage in 'reasoned decisionmaking.'" *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020). That "requirement … ordinarily demand[s] that" an agency "display[s] awareness that it is changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). If "[a]n agency … depart[s] from a prior policy *sub silentio*," *id.*, the "'[u]nexplained inconsistency' … is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice,'" *Encino*

25

*Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). And beyond simply acknowledging a change in position, the agency must also provide "a reasoned explanation … for disregarding facts and circumstances that underlay or were engendered by the prior policy," "show that there are good reasons for the new policy," and recognize "that longstanding policies may have 'engendered serious reliance interests … must be taken into account.'" *Id.* at 221-22 (quoting *Fox*, 556 U.S. at 515).

60.     As noted above, BLM has taken the position since 1977 that the phrase "maximum protection" in 42 U.S.C. §6504(a) "does *not* imply a prohibition of exploration or other activities." 42 Fed. Reg. at 28,723 (emphasis added); *see supra* ¶26. Now, however, BLM has latched onto that same statutory language as support for its attempt to "prohibit[] … some or all aspects of proposed oil and gas activities" in the Special Areas, the boundaries of which it can expand at its "discretion." 89 Fed. Reg. at 38,739, 38,757; *see id.* at 38,716.

61.     BLM executes that regulatory about-face with neither an acknowledgment nor a reasoned explanation for it—let alone a convincing justification for it in the face of four-and-a-half decades of reliance interests—even though commenters (including AOGA) emphasized the issue during the notice-and-comment period. *See* Ex.A at 9. In fact, the only relevant thing that the NPR-A Rule says about the 1977 regulation is that it "identif[ied] examples of maximum protection measures that may be implemented to protect significant resource values." 89 Fed. Reg. at 38,715.

62.     Because BLM failed to acknowledge, explain, or justify its change in position, the Court should set aside this rule as arbitrary and capricious.

26

## COUNT THREE
## APA
## Agency Action Not In Accordance With Law/
## Arbitrary and Capricious Agency Action

63.     AOGA re-alleges and incorporates by reference the preceding allegations as though fully set out herein.

64.     An agency acts "not in accordance with law" if it violates a statute or its own regulations.  *See Doe, 1 v. FEC*, 920 F.3d 866, 870 (D.C. Cir. 2019).  Likewise, "agency action may [also] be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'"  *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014).

65.     In addition, the APA requires that agency action be both "reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  "[A]n agency cannot simply ignore 'an important aspect of the problem," but rather must "offer[] 'a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.'"  *Ohio*, 144 S.Ct. at 2053.  As a corollary to that principle, agencies must "offer[]" a "reasoned response" to significant "concern[s]" raised by "commenters … during the notice and comment period."  *Id.* at 2054; *see Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019).  Thus, "[n]odding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking."  *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020); *accord Texas v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021) (collecting cases).

66.     NEPA provides that an agency must provide a "detailed statement" regarding

27

*Alaska v. Bureau of Land Management*, No. 3:24-cv-144-SLG
Case 3:24-cv-00144-SLG   Document 19   Filed 09/04/24   Page 27 of 32

the environmental effects of agency action.  42 U.S.C. §4332(2)(C).

67.     "An agency can comply with NEPA in three ways.  It can prepare an EIS [environmental impact statement]; it can prepare an EA [environmental assessment]; or it can invoke a CE [categorical exclusion].  An EIS is the most searching review.  It is required for any action 'significantly affecting the quality of the human environment.'  42 U.S.C. §4332(2)(C).  An EA is less searching.  Its central function is to determine whether an EIS is required.  40 C.F.R. §1508.9.  A CE allows an agency to avoid preparing either an EIS or an EA.   CEs are appropriate for 'actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect." *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 988 (9th Cir. 2020).

68.     Department of Interior regulations generally obligate BLM to comply with NEPA's requirement to prepare an EA or EIS "[f]or any potentially major proposed Federal action that may have potentially significant environmental impacts."  43 C.F.R. §46.200 (citation omitted).  Another regulation supplies an exception:  BLM need not prepare an EA or EIS if one of the CE categories in §46.210 applies.  *See id.* §46.205(b).  But yet another regulation creates an exception-to-the-exception:  Even if one of the §46.210 categories applies, BLM still must prepare an EA or EIS if one of the "extraordinary circumstances" in §46.215 is implicated.  *See id.* §46.210.

69.     The extraordinary circumstances listed in §46.215 include actions that "[h]ave significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or

scenic rivers; … migratory birds; and other ecologically significant or critical areas." *Id.*
§46.215(b). Another extraordinary circumstance covers actions that "[h]ave highly
controversial environmental effects or involve unresolved conflicts concerning alternative
uses of available resources." *Id.* §46.215(c). Still other extraordinary circumstances apply
when an action "[h]a[s] highly uncertain and potentially significant environmental effects,"
"[e]stablish[es] a precedent for future action or represent[s] a decision in principle about
future actions with potentially significant environmental effects," or "[h]as significant
impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened
Species or ha[s] significant impacts on designated Critical Habitat for these species." *Id.*
§46.215(d), (e), (h).

70. Here, BLM deemed the NPR-A Rule potentially major, which would
ordinarily require it to prepare an EIS or EA, but it contended that it falls within one of the
§46.210 categorical-exclusion criteria because it is a policy, directive, regulation, or
guideline "of an administrative, financial, legal, technical, or procedural nature; or whose
environmental effects are too broad, speculative, or conjectural to lend themselves to
meaningful analysis and will later be subject to the NEPA process, either collectively or
case-by-case." *See* 89 Fed. Reg. at 38,755 (quoting 43 C.F.R. §46.210(i)).

71. Even assuming *arguendo* that BLM is correct about that §46.210 factor, it
never explained why the superseding §46.215 factors would not apply. Rather, BLM baldly
asserts that the NPR-A Rule "do[es] not involve any of the extraordinary circumstances
listed in 43 C.F.R. 46.215." *Id.* That *ipse dixit* does not get the job done.

72. Under any plausible understanding of the NPR-A Rule, multiple §46.215

*Alaska v. Bureau of Land Management*, No. 3:24-cv-144-SLG

factors apply. The whole point of the rule is to generally protect "natural resources and unique geographic characteristics," including for "recreation[al] purposes." 43 C.F.R. §46.215(b); *see, e.g.*, 89 Fed. Reg. at 38,713, 38,720. And the rule specifically protects "wild or scenic rivers" and "other ecologically significant or critical areas." 43 C.F.R. §46.215(b); *see, e.g.*, 89 Fed. Reg. at 38,722. The rule is likewise replete with protections for "migratory birds" and endangered or threatened species, as well as for their habitats. 43 C.F.R. §46.215(b), (h); *see, e.g.*, 89 Fed. Reg. at 38,736-37, 38,746, 38,758. Undergirding it all is the "unresolved conflict[]" between "alternate uses" of NPR-A— between the "uncertain and potentially significant environmental effects" of industry versus the benefits of conservation, a "highly controversial" topic. 43 C.F.R. §46.215(c), (d); *see, e.g.*, 89 Fed. Reg. at 38,734, 38,744, 38,746. And BLM sets "a precedent" and reaches "a decision in principle about future actions with potentially significant environmental effects" by presuming that proposed oil-and-gas activities will adversely affect surface resources in certain special areas. 43 C.F.R. §46.215(d); *see, e.g.*, 89 Fed. Reg. at 38,722, 38,724, 38,734, 38,740.

73. Even though "BLM received a number of comments object[ing] to the BLM's intent to rely on a categorical exclusion to comply with NEPA and request[ing] that the BLM prepare an" EA, BLM sidestepped the issue and failed to provide any reasoning supporting its conclusion that no §46.215 factor applies. 89 Fed. Reg. at 38,755.

74. As set forth above, and as also explained in comments filed during the notice-and-comment period, BLM's action violates NEPA and its own regulations, and does so without adequate explanation. The NPR-A Rule thus is not in accordance with

law, arbitrary, and capricious.  The Court should set the rule aside for this reason too.

## RELIEF REQUESTED

Intervenor-plaintiff AOGA prays for the following relief from the Court:

a.  A declaration that the NPR-A Rule, 89 Fed. Reg. 38,712, exceeds Defendants' statutory authority and is arbitrary, capricious, an abuse of discretion, without observance of the procedures required by law, and otherwise not in accordance with law;

b.  A permanent injunction striking, setting aside, and enjoining Defendants from enforcing the BLM rule in its entirety or, in the alternative, a permanent injunction striking, setting aside, and enjoining Defendants from enforcing the BLM Rule as applied to AOGA and its members;

c.  An order awarding AOGA attorneys' fees and costs pursuant to 28 U.S.C. §2412; and

d.  Any further relief as the Court may deem just and proper.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
  *Counsel of Record*
ANDREW C. LAWRENCE
KEVIN WYNOSKY*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Supervised by principals of the firm
who are members of the Virginia bar

*Counsel for Intervenor-Plaintiff Alaska Oil and Gas Association*

September 4, 2024