**EXHIBIT A**



ALASKA OIL & GAS ASSOCIATION
People. Pride. Petroleum.

121 W. Fireweed Lane, Suite 207
Anchorage, AK 99503-2035
Phone: (907) 272-1481 Fax: (907) 279-8114
Email: moriarty@aoga.org
*Kara Moriarty, AOGA President/CEO*

December 7, 2023

**VIA Federal eRulemaking Portal: http://www.regulations.gov**

James Tichenor
Advisor, Office of the Director (630)
Department of the Interior
Bureau of Land Management
1849 C St. NW, Room 5646
Washington, DC 20240
ATTN: 1004–AE95

**Re:    Proposed Rule—Management and Protection of the National Petroleum Reserve in Alaska**

Dear Mr. Tichenor:

The Alaska Oil and Gas Association ("AOGA") appreciates the opportunity to comment on the Bureau of Land Management's ("BLM") proposal to issue new regulations governing the management of surface resources and Special Areas in the National Petroleum Reserve in Alaska ("NPR-A" or "Petroleum Reserve").[1] If implemented, the Proposed Rule, which presents many new substantive standards and procedural requirements, would completely overhaul the manner in which BLM manages the NPR-A. Many elements of BLM's proposal, and the proposal as a whole, give AOGA and its members serious concerns. These concerns are detailed in the following comments. AOGA requests that this comment letter and all attached appendices be included in the administrative record for this rulemaking.

AOGA is a non-profit trade association located in Anchorage, Alaska. AOGA's 14 member companies account for the majority of oil and gas exploration, development, production, transportation, refining, and marketing activities in Alaska. Most of these activities take place on the North Slope and significant AOGA member activities occur on NPR-A leases. AOGA and its members are longstanding supporters of wildlife conservation, management, and research in the

---

[1] 88 Fed. Reg. 62,025 (Sept. 8, 2023) ("Proposed Rule"). Although BLM granted a modest extension on the public comment period, it did not grant the more appropriate extension requests of Alaska Native organizations for whom this comment opportunity coincides with the traditional fall whaling season. AOGA continues to object to BLM's truncated public comment period, which is disproportionate to a regulatory proposal that will have substantial and sweeping effects on numerous diverse stakeholders.

Arctic, including in the NPR-A. AOGA and its members therefore have a significant interest in regulations governing the management of the NPR-A.

# I.  GENERAL COMMENTS

## A.      Alaska's Oil and Gas Industry.

Alaska has long been recognized as essential to the American energy supply and energy security. Alaska's oil and gas industry has a history of safe, effective, and environmentally responsible development spanning almost six decades. Beginning with the discovery of the Prudhoe Bay oilfield and the construction of the Trans-Alaska Pipeline System ("TAPS"), Alaska's North Slope has produced, and TAPS has delivered, over 18.5 billion barrels of oil.[2] It is without dispute that this production has provided unparalleled economic and social benefits to the State of Alaska, Alaska Native organizations, municipalities, all of Alaska's citizens, and to the United States as a whole. To this day, the oil and gas industry remains the backbone of Alaska's economy. Over 69,000 Alaska jobs are attributable to oil and gas investment and activity, which represents 16% of all Alaska jobs and 17% of all Alaska wages.[3] In Alaska, every direct job in the oil and gas industry creates 15 additional jobs. The oil and gas industry has contributed over $274 billion (not adjusted for inflation) to the State of Alaska through royalties and taxes, and provides the largest cash contribution to the Alaska Permanent Fund.[4]

These economic and social benefits have accrued alongside an outstanding record of human safety and environmental stewardship. This record stems in significant part from an industry commitment to employing best management practices and providing extensive training programs for North Slope workers, such as the mandatory safety training course provided through the industry-organized North Slope Training Cooperative.[5] The industry has also invested millions of dollars into protected species research, monitoring, infrastructure modifications, training, and development of environmental best practices. As one example, oil and gas operators and the U.S. Fish and Wildlife Service jointly developed procedures, training, and best practices for managing human-polar bear interactions that set the global gold standard for human-bear interactions and have been repeatedly recognized as a success.[6] As another example, operators regularly employ caribou mitigation measures, such as avoidance of off-road travel during and after peak caribou calving, to minimize potential impacts during the calving season, specifications for pipelines and roads to allow for unaltered caribou movement, and seasonal speed restrictions on vehicles.

---

[2] Alyeska Pipeline Service Company, Historic Throughput Report, https://www.alyeska-pipe.com/historic-throughput/ (last visited Dec. 6, 2023).

[3] McKinley Research Group, LLC, prepared for AOGA, *The Role of Oil and Gas in Alaska's Economy* (Aug. 2023) (available at https://www.aoga.org).

[4] *Id.*

[5] *See* Alaska Safety Alliance, North Slope Training Cooperative, http://nstc.apicc.org/ (last visited Dec. 6, 2023).

[6] *See* 73 Fed. Reg. 28,306, 28,314 (May 15, 2008) (special rule) (program has "proven to be beneficial to the conservation of marine mammals such as the polar bear"); 73 Fed. Reg. 28,212, 28,266 (May 15, 2008) (listing) (program has "proven to be highly successful in providing for polar bear conservation in Alaska").

Additionally, innovations in drilling technology have reduced the geographical footprint of oil development while, in certain circumstances, increasing the amount of resources that can be reached. Multilateral wells or sidetracked wells significantly minimize surface facilities and well footprints. As a result of these technological advances, Alaska North Slope drill pad size has shrunk from 65 acres in 1970 to as little as 14 acres today. These advances demonstrate that oil and gas can be produced efficiently in Arctic Alaska with a minimal geographic footprint and, consequently, with minimal environmental impact.

## B.    The National Petroleum Reserve in Alaska.

One hundred years ago, President Warren G. Harding reserved, by executive order, Naval Petroleum Reserve No. 4 on the North Slope of Alaska "for oil and gas only."[7] In 1976, Congress passed the Naval Petroleum Reserves Production Act ("NPRPA"), which established Naval Petroleum Reserve No. 4 as the National Petroleum Reserve in Alaska ("NPR-A" or "Petroleum Reserve"). Four years later, in response to the energy crisis and a recognition that "we can no longer delay efforts which would increase the domestic supply of oil and lessen our reliance on imports," Congress authorized production from the NPR-A.[8] The primary purpose of the Petroleum Reserve is "to increase domestic oil supply as expeditiously as possible" and "advance private oil and gas development on the NPR-A."[9]

For many decades, development of the Petroleum Reserve did not occur as expeditiously as Congress desired. However, the Greater Mooses Tooth 1 project (the first drilling site located on NPR-A leases) achieved first oil in 2018, and that was followed by the Greater Mooses Tooth 2 project, which achieved first oil in 2022. Although those projects are tangible steps toward achieving Congress's ultimate goal for the NPR-A, they account for only a small percentage of the dwindling throughput of TAPS. That will change with development of the Willow project, which is expected to more than triple Petroleum Reserve production, helping to realize the NPRPA's purpose and providing an essential boost to TAPS.

Indeed, the Willow project perfectly encapsulates Congress's vision for the NPR-A. According to BLM estimates, the project will generate $7.6 billion in federal revenues, $2.6 billion of which will be made available to North Slope communities via the NPR-A Mitigation Grant Program. It will provide $2.3 billion for the State of Alaska in production, property, and income taxes. It will produce another $1.2 billion for the North Slope Borough through *ad valorem* taxes—funding schools, emergency response, health clinics, water facilities, roads, waste facilities, and power facilities in all eight Borough villages. Constructing the Willow project will require approximately nine million man-hours supporting over 2,500 construction jobs and approximately 300 long-term jobs. These jobs will be essential to local communities that have some of the highest unemployment rates in the Nation. All of these benefits will come from the production of 600 million barrels of American oil that would otherwise be produced overseas— "increase[ing] domestic oil supply" just as Congress intended when it passed the NPRPA. The Willow project also exemplifies the innovation and stewardship for which Alaska's oil and gas

---

[7] Exec. Order No. 3797-A (Feb. 27, 1923).

[8] *See* Pub. L. No. 96-514 (1980); 126 Cong. Rec. S29489 (1980) (statement of Sen. Stevens).

[9] *ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n*, No. 3:22-CV-00121-SLG, 2023 WL 2403720, at *8 (D. Alaska Mar. 8, 2023).

industry is known. It will require a mere *three* drill sites and will adhere to 261 mitigation measures and best practices, fully in line with Congress's vision for the minimization of impacts of surface resources in the NPR-A.

For most of the last decade, BLM has managed the Petroleum Reserve in accordance with the Integrated Activity Plan ("IAP") developed by the Obama Administration in 2013 and reaffirmed by the Biden Administration in 2022. The IAP closed approximately 11 million acres (48%) of the NPR-A to leasing and made about 2.5 million acres (11%) available for leasing but subject to "No Surface Occupancy" stipulations that do not allow for surface construction (with some exceptions). The closed portions "include areas critical to sensitive bird populations and the Teshekpuk Lake and Western Arctic Caribou Herds."[10] The IAP made the remaining 9.3 million acres (41%) of the NPR-A, including areas in designated "Special Areas," available for leasing and new oil and gas infrastructure, subject to terms and conditions designed to protect the surface resources of the NPR-A. When it reaffirmed the IAP in 2022, the Biden Administration found that it "strikes a balance" among development, the "importance of surface resources," and the need to mitigate impacts on subsistence uses.[11] Indeed, the IAP includes dozens of lease stipulations and other measures designed to reduce and minimize impacts.

Many environmental groups—including the same groups who are now actively challenging the Willow project and advocating for more development restrictions in the NPR-A—strongly *supported and praised* the balance struck in the IAP. For example, the Northern Alaska Environmental Center said that the IAP "provides effective and reliable conservation measures to protect fish, wildlife and their habitats to ensure balanced management of the NPR-A, consistent with federal law."[12] Similarly, 12,600 members of the Alaska Wilderness Society wrote to BLM that this was "the most responsible and balanced management plan for the Reserve."[13] Earthjustice said that the IAP was "a positive step toward balanced management" that "allows for future oil and gas development."[14]

## C.    The Proposed Rule.

Against this backdrop, the Proposed Rule is a deliberate attempt to thwart Congressional intent and upend the balance that has already been struck for management of the NPR-A. The Proposed Rule would overlay and supplant the current management of the NPR-A with a maze of new substantive and procedural requirements applicable to all areas of the NPR-A. Among other things, these new requirements would establish strict measures hindering the ability to develop outside of Special Areas and would effectively prohibit any future development within Special Areas by creating a new presumption that such development should *not* be allowed unless an impossibly high and ambiguous standard is proven to be achieved. The proposed new regulations would also create an expansive new framework for reviewing and increasing the acreage of Special Areas every five years without any consideration of whether such areas should be

---

[10] *See* Appendix A.

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

reduced in size based on the best scientific information. The proposed regulations would establish a new, complex process that both grants new opportunities for legal challenge by project opponents and gives BLM broad, unfettered authority to restrict, delay, prohibit, and deny new proposed development activities across the entire NPR-A, or require "compensatory mitigation" for any such activities.

There is almost no aspect of the Proposed Rule than can be reconciled with Congress's intent that the Petroleum Reserve be expeditiously developed, in balance with conservation, to serve American energy needs and energy security. Congress plainly did not grant BLM authority to erect barriers to the achievement of Congress's very purpose in enacting the NPRPA—the expeditious production of oil. Many elements of the proposed new regulations have no support in the statute, rendering them *ultra vires*. "Agencies have only those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency [may] add pages and change the plot line.'"[15] To make matters worse, BLM is attempting to drive the Proposed Rule through a rushed administrative process devoid of *any* review under the National Environmental Policy Act ("NEPA") or *any* meaningful or lawful consultation with affected Alaska Native entities and communities. This lack of any lawful process, combined with the token extensions, suggests BLM is politically motivated to rush a final rule into place in advance of the 2024 elections.

Congress's concern when enacting the NPRPA in 1980 is just as urgent today as it was then. At a time when oil prices are rising and global supply can be easily constricted by foreign governments, investing in domestic oil production is a matter of national and energy security. The misguided and unlawful Proposed Rule will only deepen these concerns and, at a time of high inflation across the country, will lead to higher energy prices for working class families across America. Congress set aside the Petroleum Reserve as an important resource to address these types of concerns, not to exacerbate them. It did not establish the Petroleum Reserve to create a wilderness reserve or wildlife refuge as BLM is now proposing to effectively do. For all of these reasons, and those addressed in more detail below, BLM should withdraw the Proposed Rule and continue managing the Petroleum Reserve as it has been successfully managed in line with Congressional intent.

## II. SPECIFIC COMMENTS

### A. Congress's Primary Purpose in Enacting the NPRPA was to Expedite the Production of Oil and Gas from the NPR-A.

When President Harding established Naval Petroleum Reserve No. 4 on the North Slope of Alaska in 1923, it was one of four regions designated by Congress as Naval Petroleum Reserves, set aside for the specific purpose of ensuring a supply of oil in case of a national emergency.[16] In 1976, Congress passed the NPRPA, 42 U.S.C. § 6501 et seq., which renamed Naval Petroleum Reserve No. 4 as the NPR-A and transferred jurisdiction over the NPR-A (as well as the three other petroleum reserves) from the Navy to the Department of the Interior, in order to meet the

---

[15] *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (brackets in original) (citation omitted).

[16] Exec. Order No. 3797-A.

growing energy needs of the domestic economy and decrease reliance on foreign imports.[17] Initially, the NPRPA withheld authority for most oil and gas activities, including leasing or production, pending additional study, but allowed an exploration program to be conducted by the federal government.[18]

In 1980, Congress authorized production from the NPR-A in legislation passed as part of an effort to combat the difficulties caused by the energy crisis. *See* Pub. L. No. 96-514 (1980). Key members of the Senate and House voiced serious concerns in support of this legislation, stating that "we can no longer delay efforts which would increase the domestic supply of oil and lessen our reliance on imports,"[19] recognizing that "[w]e are in the middle of an energy crisis."[20] At the time, the federal exploration drilling program was already in place, but the government wanted to shift exploration efforts to the private sector because the federal program was of limited scope and expensive to maintain.[21] Congress therefore decided to open up the NPR-A to private companies interested in oil and gas leasing.[22] To underscore the urgency of the legislation, Congress made clear that the Secretary of the Interior was to carry out "an expeditious program" of oil and gas leasing in the NPR-A.[23]

In short, Congress's overriding purpose in enacting the NPRPA was to "increase domestic oil supply as expeditiously as possible."[24] But BLM fails to acknowledge this statutory history or purpose in the Proposed Rule and, in fact, proposed to delete language from the current regulations that acknowledges this purpose. BLM's snub of this plain legislative intent infects many aspects of the Proposed Rule, as addressed in the following sections.[25]

---

[17] Pub. L. No. 94-258, 90 Stat. 303 (codified at 42 U.S.C. §§ 6501-6508) ("[A]n Act to authorize the Secretary of the Interior to establish on certain public lands of the United States national petroleum reserves the development of which needs to be regulated in a manner consistent with the total energy needs of the Nation, and for other purposes.").

[18] H. Conf. Rep. No. 94-942, at 21 (1976); *see* 42 U.S.C. § 6504(a).

[19] 126 Cong. Rec. S29489 (1980) (statement of Sen. Stevens).

[20] 126 Cong. Rec. H20533 (1980) (statement of Rep. McDade).

[21] *See* S. Rep. No. 96-985, at 34 (1980).

[22] *See* 126 Cong. Rec. 31,196 (1980) (statement of Sen. Stevens) ("The conferees have agreed to include language to expedite *private* leasing and exploration of the entire National Petroleum Reserve in Alaska." (emphasis added)).

[23] 42 U.S.C. § 6506a(a).

[24] *ConocoPhillips Alaska, Inc.*, 2023 WL 2403720, at *8.

[25] One of many examples of this snub is BLM's proposal to eliminate the underlined language below from the statement of "objectives" in the current regulations:

> The objective of this subpart is to provide for the protection of the environmental, fish and wildlife, and historical or scenic values of the Reserve so that activities which are or might be detrimental to such values will be carefully controlled to the extent *consistent with the requirements of the Act for petroleum exploration of the reserve*.

43 C.F.R. § 2361.0-2 (emphasis added). There is no obvious or reasonable rationale for removing this objective and BLM's proposal to do so is illustrative of BLM's new (and unlawful) interpretation of the NPRPA's purpose.

B. **The Proposed Rule's Presumption Against Leasing and Development in Special Areas Directly Conflicts with the NPRPA.**

The Proposed Rule purports to make "maximum protection" of surface values "the management priority" for Special Areas in the NPR-A.[26] BLM further proposes to create a new presumption applicable to Special Areas:

> On lands allocated as available for future oil and gas leasing or new infrastructure, the Bureau *will presume that those activities should not be permitted* unless specific information available to the Bureau clearly demonstrates that those activities can be conducted with no or minimal adverse effects on significant resource values.[27]

These proposals are irreconcilable with the governing statute. The "management priority" established by the NPRPA for the *entire* NPR-A is the expeditious leasing and development of oil reserves. The statute therefore presumes that such leasing and development *will* occur, *including in Special Areas*. As the Alaska District Court recently held, restrictions or prohibitions on development "that would leave considerable quantities of economically recoverable oil in the ground is quite simply inconsistent with the Congressional policy objective of resource extraction in the NPR-A."[28] BLM has no authority to change the purpose, priority, and mandates of a Congressional act through an administrative rulemaking fiat.[29] As further explained below, BLM's proposed new "management priority" and "presumption" violate the NPRPA and are arbitrary and capricious and not in accordance with law, in violation of the APA.[30]

Congress passed the 1980 amendments to the NPRPA to "advance private oil and gas development on the NPR-A."[31] For Special Areas, Congress required that oil and gas exploration activities be "*conducted in a manner* which will assure the maximum protection of such surface

---

[26] 88 Fed. Reg. at 62,035, 62,042 (proposed 43 C.F.R. § 2361.40).

[27] 43 C.F.R. § 2361.40(c) (as proposed) (emphasis added).

[28] *Sovereign Inupiat for a Living Arctic v. BLM*, No. 3:23-CV-00058-SLG, 2023 WL 7410730, at *7 (D. Alaska Nov. 9, 2023).

[29] *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023) ("The Secretary's assertion of administrative authority has 'conveniently enabled [him] to enact a program' that Congress has chosen not to enact itself." (*quoting West Virginia*, 142 S. Ct. at 2614)).

[30] The proposed presumption provision, particularly the phrase "can be conducted with no or minimal adverse effects on significance resource values" is also extraordinarily vague, lacking guidelines to avoid arbitrary and discriminatory enforcement. The proposed 43 C.F.R. § 2361.40(c) is therefore also unconstitutionally vague. *Big Mama Rag, Inc. v. United States*, 631 F.2d 1030, 1035 (D.C. Cir. 1980) (finding the regulation at issue was unconstitutionally vague by lacking terms susceptible of objective measurement); *see also Smith v. Goguen*, 415 U.S. 566, 572 (1974); *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

[31] *ConocoPhillips Alaska, Inc.*, 2023 WL 2403720, at *13.

values to the extent *consistent with the requirements of this Act. . . .*"[32] Therefore, Congress intended that oil and gas activities *would* occur "in a manner" that is protective of surface values. Indeed, the Alaska District Court recently applied the statute's plain language to hold that "[a]lthough Congress directed 'maximum protection' to be accorded to significant surface values in the TLSA and other Special Areas while undertaking oil and gas activities in the NPR-A, *it still clearly envisioned that the TLSA would be developed for oil and gas production*."[33] One must look no further than the statute's plain language to determine that BLM's proposed new presumption turns the established statutory presumption on its head.

Moreover, both the legislative history and regulatory history of the NPRPA show that the maximum protection requirement was not intended to create a presumption against oil and gas activities.[34] In fact, the opposite is true. The phrase "maximum protection" was included in the NPRPA in 1976, and the House Conference Report ("Report") states that "'maximum protection of such surface values' is *not a prohibition* of exploration-related activities within such areas" but instead is intended to ensure "that such exploration operations *will be conducted* in a manner which will *minimize the adverse impact* on the environment."[35] The Report went on to observe that minimizing adverse impacts in Special Areas meant the implementation of measures such as scheduling exploration activities at times of the year when they would have the least adverse influence on wildlife. *Id*. As the Alaska federal district court has explained:

> [A]llowing development in the TLSA fails to provide "maximum protection" in the absolute sense. But that is not the test. The test is, as Intervenors argue, one of relativity; the degree of protection must be consistent with NPRPA. One of the stated objectives of NPRPA is the "expeditious program of competitive leasing of oil and gas in the Reserve." 42 U.S.C. § 6506a(a). Thus, the Secretary must necessarily balance the leasing of the lands in the TLSA with the protection of the environment. In other words, the Secretary must balance the impact on the environment with the countervailing and, inevitably conflicting, mandate to develop a program of competitive leasing. *See* 42 C.F.R. § 6321.0-2. The Secretary, as he recognizes in his regulations, in developing the leasing program must provide maximum protection for the TLSA. However, as noted above, maximization of protection of the environment does not mean that a leasing program provide maximum protection, but that to the extent that the leasing

---

[32] 42 U.S.C. § 6504(a) (emphases added).

[33] *Sovereign Inupiat*, 2023 WL 7410730, at *7 (emphasis added).

[34] *Nebraska*, 143 S. Ct. at 2378 (Barrett, J., concurring) ("After all, the meaning of a word depends on the circumstances in which it is used. . . . To strip a word from its context is to strip that word of its meaning.").

[35] H. Conf. Rep. No. 94-942, at 21 (emphases added).

> program permits development, that development be conducted in a
> manner that provides maximum protection.[36]

Similarly, BLM's 1977 final rule establishing the NPRPA implementing regulations explains
that "[m]aximum protection of designated special areas does not imply a prohibition of
exploration or other activities."[37] Instead, as Congress instructed, assuring "maximum
protection" involves the application of protective measures to activities that are presumed to
occur in Special Areas. Therefore, BLM prescribed by regulation such measures as:
"(1) [r]escheduling activities and use of alternative routes, (2) types of vehicles and loadings,
(3) limiting types of aircraft in combination with minimum flight altitudes and distances from
identified places, and (4) special fuel handling procedures."[38] This appropriately reflects the
statutory intent to allow activities in Special Areas subject to protective measures. BLM's new
presumed ban on activities in Special Areas directly contradicts that statutory intent.[39]

The legislative and regulatory history make perfect sense in light of the Congressionally directed
study "to determine the best overall procedures to be used in the development, production,
transportation, and distribution of petroleum resources in the [NPR-A]."[40] This study culminated

---

[36] *Nat'l Audubon Soc'y v. Kempthorne*, No. 1:05-CV-00008-JKS, 2006 WL 8438583, at *15 (D. Alaska
Sept. 25, 2006); *see Sovereign Inupiat for a Living Arctic v. BLM*, 555 F. Supp. 3d 739, 769 (D. Alaska
2021) ("infrastructure is allowed, and indeed anticipated, within the TLSA"). BLM's proposal to presume
no activities should be conducted (contrary to all applicable authorities) constitutes an unlawful
application of a precautionary presumption that has no support in the underlying statute. In *Maine
Lobstermen's Association v. National Marine Fisheries Service*, the D.C. Circuit struck down a similar
overreach of agency authority as "not just wrong" but "egregiously wrong." 70 F.4th 582, 599 (D.C. Cir.
2023). The court explained:

> The presumption in favor of the species is, like an adequate margin of
> safety, a blunt tool. The presumption significantly expands the Service's
> veto power, prevents the agency from "paying attention to the
> advantages *and* the disadvantages" of the action, and invites the
> unnecessary economic dislocation wrought by worst-case thinking. . . .
> The result may be great physical and human capital destroyed, and
> thousands of jobs lost, with all the degradation that attends such
> dislocations. Nor are humans the only casualties of worst-case thinking:
> A presumption in favor of one protected species may jeopardize another.
> We may reasonably expect the Congress at least to speak, not to be
> silent, when it delegates this power to destroy.

*Id*. at 599-600.

[37] 42 Fed. Reg. 28,723 (June 3, 1977) (instructing BLM to take steps to "minimize adverse impacts" on
resource values in Special Areas).

[38] 43 C.F.R. § 2361.1(c).

[39] The Proposed Rule fails to acknowledge that its new presumption against development represents a
change in policy from the 1977 regulations. This violates the APA. *F.C.C. v. Fox Television Stations,
Inc.*, 556 U.S. 502, 515 (2009) ("the requirement that an agency provide reasoned explanation for its
action would ordinarily demand that it display awareness that it *is* changing position" and "the agency
must show that there are good reasons for the new policy").

[40] Pub. L. No. 94-258, § 105(b), 90 Stat 303, 305 (requiring study).

in the U.S. Department of the Interior's ("DOI") *Final Report of the 105(b) Economic and Policy Analysis* (Dec. 15, 1979) ("Final Report").[41] The Final Report directly informed the 1980 legislative amendments to the NPRPA.[42]

In the Final Report, DOI analyzed five different approaches to management of the NPR-A: (1) accelerated petroleum development; (2) management through traditional OCS-type leasing and development procedures; (3) public sector exploration, development, and production; (4) major attention to environmental values; and (5) accelerated development with major attention to environmental values. The Final Report identified Approach 2 as the "base case."[43]

With the exception of Approach 4, all of these approaches presumed that oil and gas development would occur in Special Areas. As to Approach 4, DOI found that it "results in the lowest value of oil and gas deliveries of the five management approaches."[44] It explained that "[t]he potential contribution of Approach 4 to a reduced dependence on imported oil and gas is mainly affected by withdrawal of the environmentally sensitive areas and by prohibitions of transportation corridors across these areas."[45] Thus, Approach 4 "prove[d] to be the least effective in promoting economic benefit to the Nation because of the restrictions on land available for production and transportation and the slower pace of operations."[46] This undermined one of the primary stated concerns of the Final Report: "[O]ur increasing reliance on petroleum imports exposes the United States to the risk of economic disruption and international political influence."[47]

Importantly, even Approach 5—which required "major attention to environmental values"— balanced that protection with expeditious development, including in Special Areas (as Congress directed). Approach 5's "emphasis on environmental protection is achieved by instituting environmental regulations and stipulations more stringent than those in the base case in [Special Areas]."[48] The "major" protections considered by Approach 5 were "such stipulations and controls as those currently applied in the NPR-A, those applied during construction and operation of TAPS, and those proposed for [the Alaska Highway Gas Pipeline System]."[49] These extra protections were assumed "to result in a 15-percent increase in costs in the specified areas."[50] These were the types of measures that DOI (and Congress) considered sufficient to achieve "maximum protection" of surface resources in Special Areas. "Of the five approaches

---

[41] A true and correct copy of the Final Report is included in Appendix B to this letter.

[42] *See ConocoPhillips Alaska, Inc.*, 2023 WL 2403720, at *8 ("The Rider cites to the [Final] Report, and it is thus reasonable to assume Congress relied upon the [Final] Report when drafting the Rider.").

[43] *See* Final Report at 6-8.

[44] *Id*. at 10.

[45] *Id*. Approach 4 had dramatically less production than the other approaches because a substantial portion of the NPR-A resources are found within Special Areas. *See* Final Report at 5-6, 20-25.

[46] *Id*.

[47] *Id*. at 1.

[48] *Id*. at 73.

[49] *Id*.

[50] *Id*.

analyzed, Approach 5 rank[ed] a close third in its contribution to the national goal of reducing dependence on imported oil and gas."[51]

The Final Report also evaluated "the economic implications on oil and gas production of two major land use designations . . . (1) management with specific areas designated wildlife refuges and (2) management with specific areas designated wilderness areas." For either option, "[s]ignificant percentage reductions in the achievement of the national objectives of reduced dependence on foreign petroleum, increases in national wealth, and fair return to the public were often found to result."[52] Additionally, the Final Report found fault with the wildlife refuge option because it would require that "protection and enhancement of fish and wildlife *take precedence over* all other uses and activities," resulting in "oil and gas operations [being] either prohibited or severely regulated."[53] This is precisely what the Proposed Rule attempts to accomplish by making protection of surface values the new "management priority" in Special Areas (*i.e.*, those values would "take precedence" over oil and gas uses). If this was what Congress had intended in the NPRPA, then it would not have rejected the wildlife refuge option (or Approach 4) when it amended the NPRPA in 1980.[54]

Finally, historical context demonstrates that Congress did not intend for "maximum protection" to establish a presumption against oil and gas activities. Before the 1980 NPRPA amendments were passed, exploration activities were substantially more impactful than they are now.[55] Thus, Congress wanted to encourage the use of ice roads and other less intrusive "new" technologies to maximize protections.[56] Today, ice roads and other technologies and mitigations are standard practice and, indeed, exploration activities in the NPR-A leave no trace of activity other than insignificant well caps.[57] Indeed, standard practices today—for both exploration and

---

[51] *Id*. at 78.

[52] *Id*. at 10.

[53] *Id*. at 81 (emphasis added).

[54] By creating an express presumption against oil and gas activities and establishing a new "management priority" in favor of protecting surface resources, BLM proposes to establish a *de facto* wilderness reserve in the Special Areas of the NPR-A. This is unlawful because BLM attempts to do so by avoiding the appropriate statutory processes for establishing such reserves. It is also unlawful because it violates Section 1326 of the Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3213.

[55] *See* Appendix C.

[56] *Id*.

[57] The Proposed Rule appears to presume that the "maximum protection" clause in the NPRPA applies to exploration, development, and production activities in the NPR-A. However, the NPRPA expressly states that that clause applies only to "exploration." 42 U.S.C. § 6504(a). *United States v. Hunter*, 101 F.3d 82, 84 (9th Cir. 1996) ("Absent a clearly expressed legislative intention to the contrary, the plain language of the statute is ordinarily conclusive."); *id*. (citing *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982)). This text was put into the Act in 1976, when only "exploration" was authorized, and on its face continues to apply only to "exploration" activities. Indeed, BLM acknowledges that the term "exploration" means only exploration activities by proposing to define the term as "activities conducted on the Reserve for the purpose of evaluating petroleum resources, including crude oil, gases (including natural gas), natural gasoline, and other related hydrocarbons, oil shale, and the products of any such resources." 43 C.F.R. § 2361.5 (as proposed).

development activities—achieve what Congress intended by requiring "maximum protection" of surface areas in 1976.

In sum, BLM's proposal to change the "management priority" for Special Areas and establish a new presumption against oil and gas development in those areas directly conflicts with Congressional intent, as reflected in the plain statutory language, legislative history, regulatory history, and factual historical context. BLM has no authority to override Congress's expressly stated intent through an administrative rulemaking.[58]

## C.    BLM Proposes Additional Unreasonable and Unlawful Permitting Burdens for Activities in Special Areas.

Although BLM appears to acknowledge that it cannot entirely rule out activities in Special Areas, it proposes to make the process for doing so an administrative impossibility (assuming any proposal could overcome the new proposed presumption against such activities). This renders all of proposed 43 C.F.R. § 2361.40 unlawful because Congress plainly did not intend to stymie development of the NPR-A, including Special Areas, with administrative barriers. Some of the most egregious examples of BLM's proposed administrative overreach in proposed section 2361.40 are as follows.

BLM proposes that, in Special Areas, it "may approve new permanent infrastructure related to existing oil and gas leases only if such infrastructure is essential for exploration or development activities and no practicable alternatives exist which would have less adverse impact on significant resource values of the Special Area, but only if necessary to comport with the terms of a valid existing lease."[59] This provision is unlawful for numerous reasons.

First, by limiting infrastructure in Special Areas only to that which is "essential" and for which "no practicable alternatives exist," BLM is establishing an additional implied presumption that no infrastructure can be installed in Special Areas. This undermines express Congressional intent, as set forth in the sections above, and the NPRPA contains no such constraints or requirements. Second, these ambiguous standards give the government authority to make determinations about "essential" and "practicable" infrastructure that private developers are uniquely qualified to make, not government officials. This is contrary to Congress' decision to open the NPR-A to private development and exploration. Third, to the extent this provision applies to infrastructure *on* existing leases in Special Areas, it violates the terms of those leases and the rights of the leaseholders holding those leases. There are no terms in NPR-A leases that restrict use in the manner stated in proposed 43 C.F.R. § 2361.40(d)(3). Nor does a leaseholder have any obligation under the NPRPA or the terms of the lease to affirmatively demonstrate that "infrastructure" for developing a lease (whether on the lease or off the lease) is "essential" to that

---

[58] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). For all of the reasons explained above, BLM also has no authority to grant itself the ability to "delay[] action on, or deny[] proposals for activities [in Special Areas] either in whole or in part." *See* 43 C.F.R. § 2361.40(b) (as proposed); *see West Virginia*, 142 S. Ct. at 2609 ("Agencies have only those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency [may] add pages and change the plot line.'" (brackets in original) (citation omitted)).

[59] 43 C.F.R. § 2361.40(d)(3) (as proposed).

development and that there are "no practicable alternatives." Finally, the terms "essential" and "practicable" are unconstitutionally vague because they are not susceptible of objective measurement.[60]

Next, BLM proposes in subpart (f) to establish new, overly burdensome requirements, such as a directive that BLM prepare a "Statement of Adverse Effect" that must address numerous elements. This would be a substantively meaningless exercise that duplicates the information and analyses to be disclosed for public review pursuant to NEPA for any new NPR-A development. A requirement to prepare a "Statement of Adverse Effect" and the need to comply with the other new requirements proposed in subpart (f) would only serve to delay the administrative process, for no substantive reason, and create new opportunities for environmental activists to exploit in challenging future NPR-A projects. And it erects yet another barrier to achieving Congress's intent in enacting the NPRPA.

Finally, BLM proposes in subpart (f)(6) to grant itself the authority to require "compensatory mitigation." BLM cites no statutory authority that allows it to require compensatory mitigation for projects in the NPR-A and, indeed, there is none. Such a requirement would therefore be *ultra vires*.[61]

### D. BLM Proposes Unlawful New Requirements Appliable to All Surface Resources of the NPR-A.

Proposed 43 C.F.R. § 2361.10 would establish new requirements for protecting "surface resources" across the NPR-A. As addressed below, many elements of this proposed subsection have no support in, and directly conflict with, the NPRPA.

***First***, in proposed subsection 2361.10(a), BLM claims the authority to condition, restrict, or prohibit activities, including "delaying action on, or denying some or all aspects of proposed activities."[62] The NPRPA gives BLM no authority to delay or deny activities. Although the NPRPA allows BLM to include "conditions, restrictions, and prohibitions" to mitigate "reasonably foreseeable and significantly adverse effects," those terms expressly apply to

---

[60] *See Big Mama Rag, Inc.*, 631 F.2d at 1035; *see also Smith*, 415 U.S. at 572; *Grayned*, 408 U.S. at 108.

[61] *See Killip v. Off. of Pers. Mgmt.*, 991 F.2d 1564, 1569-70 (Fed. Cir. 1993) ("Though an agency may promulgate rules or regulations pursuant to authority granted by Congress, no such rule or regulation can confer on the agency any greater authority than that conferred under the governing statute. . . . Such action by an administrative agency violates the principle that an agency is strictly limited by the authority granted by Congress, and therefore can have no effect.").

[62] Proposed subsection 2361.10(a) properly recognizes that BLM's claimed authority must be "consistent with the requirements of the Act, the terms of any applicable existing authorization, and applicable law." *However*, the preamble of the Proposed Rule (but not the proposed regulation itself) states that "[t]he proposed rule would specify that the authorized officer has that authority 'regardless of any existing authorization.'" 88 Fed. Reg. at 62,033. The language "regardless of any existing authorization" is not included in the proposed regulatory language, nor should it be. Aside from the other reasons why proposed subsection 2361.10 is unlawful, inclusion of that phrase would unlawfully usurp the rights of existing leaseholders or permit holders for NPR-A projects.

"[a]ctivities undertaken."[63] Activities "undertaken" are not activities denied or delayed, and the NPRPA's use of the word "prohibitions" plainly refers to prohibited aspects of activities *not* the activities themselves (which are to be "undertaken"). Moreover, delaying or denying activities is inconsistent with the overarching purpose of the NPRPA, which, as explained above, is to encourage "expeditious" oil and gas development. Proposed subsection 2361.10(a) therefore violates the NPRPA and, if implemented, would be unlawful and *ultra vires*.[64]

**Second**, in proposed subsection 2361.10(b), BLM enumerates new requirements to protect against "reasonably foreseeable and significantly adverse effects," which include "effects that are later in time or farther removed in distance, and effects that result from the incremental effects of the proposed activities when added to the effects of other past, present, and reasonably foreseeable future actions."[65] BLM claims it has authority to delay or deny actions to mitigate for such effects, and would require itself to account for "uncertainty" when doing so.[66] For the reasons stated above, BLM has no authority to delay or deny activities to mitigate reasonably foreseeable and significantly adverse effects, particularly when based on mere "uncertainty."

Moreover, BLM's proposed use of the word "uncertainty" in this instance is incredibly vague and broad, and has no support in the NPRPA, which contains no references to "uncertainty." As a practical matter, effects of an action will always contain some element of uncertainty because natural processes, and the nature of physical life generally, are dynamic. The inclusion of "uncertainty" in the regulations is an unlimited grant of authority to BLM to condition, delay, or deny activities based on nothing other than what BLM may determine to constitute "uncertainty." This renders the provision both unconstitutionally void for vagueness and *ultra vires*. It also illustrates BLM's apparent intent to grant itself authority to make decisions that are *not* based on the "best available science," as required by Executive Order 13563.[67] The D.C. Circuit recently emphasized the unlawfulness of agency actions that ignore the best available science in favor of erring on the side of assuming that impacts will occur when there is uncertainty, explaining:

> [W]hen the Congress wants an agency to apply a precautionary principle, it says so. Consider the Clean Air Act, for example, requiring an adequate margin of safety when the EPA sets air quality standards. The precautionary principle, taken seriously, can multiply an agency's power over the economy. It allows an agency to regulate or veto activities even if it cannot be shown that those activities are likely to produce significant harms. That is

---

[63] 42 U.S.C. § 6506a(b).

[64] Delaying or denying activities proposed by a leaseholder would violate the terms of the proponent's lease. Moreover, disallowing or indefinitely delaying development is the same as canceling or terminating a lease. BLM may only terminate or cancel leases in situations where there is a failure to produce. The Proposed Rule would *inhibit* the ability to produce.

[65] *See* 43 C.F.R. § 2361.10(b)(3) (as proposed).

[66] *See id* § 2361.10(b)(4) (as proposed).

[67] *See* Exec. Order No. 13,563, *Improving Regulation and Regulatory Review* § 1(a), 76 Fed. Reg. 3,821 (Jan. 21, 2011).

> particularly significant because uncertainty is not unusual in day-
> to-day agency decisionmaking within the Executive Branch.[68]

There is nothing in the NPRPA authorizing BLM to precautionarily account for uncertainty in the manner it has proposed.

***Third***, it appears that BLM, in proposing to define "reasonably foreseeable and significantly adverse effects," is claiming the authority to impose measures and conditions to address the effects of "incremental" GHG emissions-related effects (including any related "uncertainty") of potential NPR-A surface resources. Again, this has no support in the NPRPA. The statute narrowly grants BLM the ability to address "*significantly* adverse effects on the surface resources," *not* "uncertain" effects or effects that are *de minimis* or immeasurable. Based on the best available scientific information, BLM cannot establish any significant connection between individual project GHG emissions and effects on the "surface resources" of the NPR-A, and even if a connection could be made, such effects would be immeasurable and statistically insignificant.[69]

***Fourth***, and more broadly, these proposed new requirements appear to be an implausible attempt by BLM to graft a "keep it in the ground" policy onto the NPRPA. The overriding purpose of the NPRPA is to *increase* the production of oil, not to ameliorate the long-term consequences of global climate change by imposing conditions to *restrict* the production of oil based on uncertain and unidentifiable impacts from oil production projects in the NPR-A. The statutory reference to "surface resources" plainly refers to on-the-ground development activities—*not* to the uncertain and unidentifiable downstream effects of GHG emissions related to those development activities. In short, "[t]here is little [or no] reason to think Congress assigned" to BLM the duty to regulate GHG emissions under the NPRPA.[70]

## E.   Certain Proposed Provisions Relating to Establishment of Special Areas Exceed Statutory Authority and Are Unnecessary.

Proposed 43 C.F.R. § 2361.30 would create new detailed provisions governing the establishment of Special Areas in the NPR-A. AOGA does not dispute that the NPRPA gives BLM authority to establish Special Areas in the NPR-A and to revise, add, or remove Special Areas. AOGA also agrees that the process for revising, adding, or removing Special Areas should be informed by full public review and input. However, the existing established process for preparing, presenting

---

[68] *Maine Lobstermen's Ass'n*, 70 F.4th at 599-600 (citations and internal quotation marks omitted).

[69] *See Sovereign Inupiat*, 2023 WL 7410730, at *40 ("Plaintiffs have not shown any available scientific evidence that links Willow's projected GHG emissions to a reasonably certain decrease in sea ice impacting polar bears in the Action Area. As BLM acknowledged, Willow 'is anticipated to result in a marginal increase in global GHG emissions that would contribute to climate change and, potentially, a marginal seasonal decrease in sea ice extent somewhere in the Arctic.' But as FWS explained, 'an estimate of a project-caused decrease in sea ice occurring somewhere in the Arctic, without more specific information (e.g., location and type of affected sea ice, use [if any] of that sea ice by listed species and their prey/forage, etc.,) does not enable us to predict any "effects of the action" to listed species or critical designated habitat.'"); *see also* Appendix D.

[70] *West Virginia*, 142 S. Ct. at 2612.

for public review and comment, and finalizing IAPs serves that need. In the Proposed Rule, BLM identifies no concrete reasons why the existing IAP process does not work for revising, adding, or removing Special Areas. Accordingly, AOGA recommends that BLM continue to use the IAP process for addressing Special Area designation. If BLM nevertheless proceeds to implement unnecessary regulations to govern that process, AOGA objects to several of the proposed provisions in subsection 2361.30 because they are either arbitrary or exceed BLM's statutory authority.

*First*, subsection 2361.30(a)(1) would create a new process under which BLM must review existing Special Areas every five years to determine whether to designate new areas, expand existing areas, or identify additional "significant resource values." BLM generically claims that a new five-year process is needed to "regularly address changing conditions."[71] However, BLM identifies no reason that the existing IAP process cannot account for changing conditions. Moreover, despite changing conditions in the Arctic over the past decade, there is no information showing that concomitant changes to Special Areas have been necessary. Indeed, as recently as 2022, BLM finalized another IAP concluding that the existing Special Areas are appropriate.

Therefore, AOGA recommends that BLM remove the five-year review requirement and, instead, allow for changes to Special Areas when the best available information demonstrates that such changes are necessary. Additionally, if BLM persists in retaining this review process, the regulations should include consideration of whether Special Areas should be contracted or removed. It is arbitrary to establish a process that is limited to expanding or adding new Special Areas. BLM has no statutory authority to make Special Areas permanent.

*Second*, proposed subsection 2361.30(a)(5) would allow BLM to adopt interim measures to "assure maximum protection of significant resource values" before an area is designated as a Special Area. But the NPRPA's "maximum protection" clause expressly applies only to Special Areas "*designated*" by the Secretary of the Interior."[72] This clause does not apply to areas "to be designated." Proposed subsection 2361.30(a)(5) therefore exceeds BLM's statutory authority and should be stricken.

*Third*, proposed subsection 2361.30(b) states that "BLM may not remove lands from the Teshekpuk Lake and Utukok River uplands Special Areas unless directed to do so by statute." This, too, exceeds BLM's statutory authority. The NPRPA does not specify a geographic boundary for the Teshekpuk Lake and Utukok River Special Areas, much less make the current designations permanent. BLM has no authority to lock the current Special Area designations in place, making it impossible to revise the designations in the future as the best scientific information warrants.[73]

---

[71] 88 Fed. Reg. at 62,031.

[72] 42 U.S.C. § 6504(a) (emphasis added).

[73] *West Virginia*, 142 S. Ct. at 2609 ("Agencies have only those powers given to them by Congress, and 'enabling legislation' is generally not an 'open book to which the agency [may] add pages and change the plot line.'" (brackets in original) (citation omitted)).

F.     **BLM Must Clarify That the Proposed Regulations Do Not Apply to Existing NPR-A Leases and Future Activities Carried Out Pursuant to Those Leases.**

In the Proposed Rule, BLM states: "The proposed rule would not affect existing leases in the NPR-A."[74] However, the proposed regulations contain no such express statement and, as proposed, do apply to existing NPR-A leases and future activities on those leases. For example, proposed subsection 2361.10 applies to all areas of the NPR-A, proposed subsection 2361.40 applies to all Special Areas, and proposed subsection 2361.70 applies to "any use within the Reserve." None of these subsections includes an exemption for existing leases. All of these proposed subsections, if issued in final, must be revised to expressly state that they do not apply to any existing leases and future activities carried out pursuant to the terms of those leases, as BLM apparently intends.[75]

If, in fact, BLM *does* intend for the proposed regulations to apply to existing leases and activities carried out under those leases, then BLM must revise and reissue the Proposed Rule clearly identifying what elements of the proposed regulations apply to existing leases so that the public (and interested existing leaseholders in particular) may understand the implications and comment in an informed manner. Any such clarification and reissuance must also be accompanied by an appropriate NEPA review and new analyses that comply with Executive Orders 12,866, 14,094, and 13,563 (Regulatory Planning and Review); the Regulatory Flexibility Act; Executive Order 12,630 (Takings); and Executive Order 13,211 (Effects on the Energy Supply). The reviews and analyses BLM performed to purportedly comply with those authorities for the Proposed Rule assume that the proposed regulations do *not* apply to existing leases and future activities on those leases. Thus, if BLM actually intends for some or all of the proposed regulations to apply to existing leases and associated future activities, then it must revisit and reissue the appropriate reviews and analyses to comply with all of those authorities.

For example, in the Economic Analysis prepared for the Proposed Rule, BLM states that "[t]he proposed rule would not affect existing leases or operations in the NPR-A."[76] Additionally, the Economic Analysis expressly assumes that the new presumption stated in proposed subsection 2361.40(c) applies only to "new leasing and infrastructure" in "unleased areas."[77] Despite these clear statements and assumptions by BLM, proposed subsection 2361.40(c) contains no such clarity. Instead, it purports to apply to "lands allocated as available for future oil and gas leasing

---

[74] 88 Fed. Reg. at 62,026.

[75] BLM also states that that the "the proposed rule would have no effect on existing activities" (*id*. at 62,029) and "no effect on currently authorized oil and gas operations in the NPR-A" (*id*. at 62,025). These statements should also be codified in any final regulations.

[76] Economic Analysis at 2; *see also id*. at 5 (stating same and that "[w]here leases currently exist within existing Special Areas, there will be no effects").

[77] *Id*. at 5. Table 1 (titled "Special Areas open for leasing or new infrastructure under the baseline") confirms this by only listing *unleased* acreage. *Id*. at 5-6. However, the Economic Analysis creates some confusion on this point as it refers to "unleased areas" in "Maps 2 and 4 from the 2022 ROD." *Id*. at 5. Maps 2 and 4 from the 2022 IAP ROD also show *leased* areas as available for new infrastructure. This underscores why BLM must clarify that proposed subsection 2361.40© does not apply to existing leases or future activities carried out pursuant to those leases.

or new infrastructure."

Thus, if it proceeds to issue final regulations, BLM must modify the regulations to clarify that they do not apply to existing leases or activities carried out pursuant to those leases. If that is not BLM's intent, then it must, along with revising and reissuing a Proposed Rule for informed public review and comment, prepare an entirely new Economic Analysis that evaluates the effects of the new presumption on all reasonably foreseeable future activities on currently leased lands in Special Areas as well as re-perform all the other required analyses enumerated above, particularly the takings analysis for all affected existing leases. Leaseholders will need to understand BLM's specific intent to evaluate how their leases will be affected and to be afforded the opportunity to state all legal objections and identify the ways in which any proposed regulations that BLM intends to apply to existing leases violate the terms of those leases.

## G.    The Proposed Rule Violates NEPA.

BLM's purported compliance with NEPA amounts to two sentences in the Proposed Rule:

> This proposed rule meets the criteria set forth at 43 CFR 46.210(i) for a Departmental categorical exclusion in that this proposed rule is 'of an administrative, financial, legal, technical, or procedural nature.' They do not involve any of the extraordinary circumstances listed in 43 CFR 46.215.[78]

BLM provides no explanation for *why* the cited categorical exclusion purportedly applies or *why* none of the extraordinary circumstances apply. The only hint of BLM's rationale is found in the Economic Analysis, in which BLM states that "most of the provisions of the proposed rule are editorial, administrative, or otherwise have no economic cost or benefit."[79] This is a gross mischaracterization of the Proposed Rule.

***First***, by BLM's own admission, the Proposed Rule "would improve upon the existing regulations' standards and procedures to balance oil and gas activities with the protection of surface resources in the NPR-A; designate and assure maximum protection of Special Areas' significant resource values; and maintain and enhance access for long-standing subsistence activities."[80] BLM further states that the Proposed Rule "enhance[s] the specificity of the current regulations on the mechanisms for assuring maximum protection of significant resource value" and that, although existing regulations "paraphrase the maximum protection requirement of the NPRPA and provide examples of measures that the BLM could potentially take," the proposed regulations "*establish new standards* and procedures for achieving maximum protection."[81] BLM's summary of the Proposed Rule states:

> The Bureau of Land Management (BLM) is proposing *a new rule to govern the management of surface resources and Special Areas*

---

[78] 88 Fed. Reg. at 62,038.

[79] Economic Analysis at 1.

[80]  88 Fed. Reg. at 62,026.

[81]  *Id.* at 62,035 (emphasis added).

> in the National Petroleum Reserve in Alaska (NPR-A), consistent
> with its duties under the Naval Petroleum Reserves Production Act
> [and other laws]. The proposed rule would *revise the framework*
> for designating and assuring maximum protection of Special
> Areas' significant resource values, and would protect and enhance
> access for subsistence activities throughout the NPR-A[, and]
> incorporate aspects of the NPR-A Integrated Activity Plan (IAP)
> approved in April 2022. [It] would have no effect on currently
> authorized oil and gas operations in the NPR-A.[82]

Thus, in BLM's own words, the Proposed Rule "improve[s] upon" existing regulatory standards, "enhances" regulations applicable to the "maximum protection" standard, "establishes new standards," represents a "new rule to govern the management" of the NPR-A, and "revise[s] the framework" for assuring "maximum protection."[83] These changes cannot, by any stretch of the imagination, be characterized as "editorial" or "administrative." Rather, they are *substantive* changes and additions to the existing regulations that fundamentally alter how the NPR-A will be managed. Indeed, it is hard to imagine that BLM would have gone to the lengths of replacing an entire subpart of existing regulations just because it wanted to make editorial or administrative changes.[84]

Accordingly, the Proposed Rule is a "major federal action" as it reflects a new "[a]doption of official policy" and "will result in or substantially alter agency programs."[85] BLM cannot therefore categorically exclude the Proposed Rule from NEPA and must conduct a full NEPA review.[86] This requirement holds even if BLM views the changes it is proposing as only beneficial.[87]

**Second**, the Proposed Rule would change the *status quo* for how the NPR-A is managed. Currently, management of the NPR-A is governed by the IAP, which was informed and implemented through a rigorous public process, including preparation of an EIS, public review and comment, consultation with affected Alaska Native communities, and issuance of a comprehensively documented record of decision. Although the Proposed Rule adopts *portions* of

---

[82] 88 Fed. Reg. at 62,025.

[83] To further emphasize the confusion in BLM's proposal, BLM arbitrarily states that the Proposed Rule "establishes new standards" and, when justifying its failure to make a good faith effort in complying with Executive Orders, that the Proposed Rule would merely "restate existing statutory standards." Obviously, both cannot be true.

[84] Environmental advocates also disagree with BLM's characterization of the Proposed Rule as merely "editorial" or "administrative." They state that BLM is "making it harder to develop petroleum in a petroleum reserve" and note that the Proposed Rule would enact new "durable protections for the irreplaceable landscapes and habitats of the [NPR-A]." Appendix E.

[85] 40 C.F.R. § 1508.1(q)(3).

[86] *See California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018 (9th Cir. 2009).

[87] *See* 40 C.F.R. § 1508.1(g)(4) ("Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effects will be beneficial.").

the IAP, the proposed regulations expressly govern all conflicts with the IAP.[88] Under the Proposed Rule, BLM can effectively modify the IAP by creating new Special Areas (or expanding existing Special Areas) without any formal modification to the IAP and associated public process. BLM would also be able to establish new measures for any new or expanded Special Area and those new measures would supersede any inconsistent provisions in the IAP. Accordingly, if issued in final, the Proposed Rule supplants the *status quo* management framework established by the IAP and does so without *any* NEPA review. This is particularly arbitrary and unlawful given that the IAP was established through a very public process informed by a full EIS.

**Third**, the Proposed Rule would create a new presumption that leasing or development cannot occur in Special Areas, *even if those areas are presently open to leasing under the IAP*. In the IAP, and after a full NEPA process, BLM made the calculus that those areas should be open to leasing. Yet, if and when the Proposed Rule is issued in final, there would be a new standard stating that those same areas designated as *open* for leasing and development are now *presumed to be closed* to leasing and development. This is a significant material change to the *status quo* that requires NEPA review as it, too, "will result in or substantially alter agency programs."[89]

Alternatively, even if BLM could justify a categorical exclusion in this case (which it legally cannot), multiple "extraordinary circumstances" exceptions apply under 43 C.F.R. § 46.215 that would prevent BLM from doing so. For example, § 46.215(d) creates an exception for proposals that "[h]ave highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks." Here, there are potentially significant socio-economic effects. If the presumption against new development in Special Areas results in the denial of just one proposed project for a single modest well site producing 10,000 barrels per day, then over $200,000,000 annually (assuming a price of $60/barrel) will be prevented from entering the economy, impacting every resident on the Alaska North Slope and in the state of Alaska. And even BLM admits that the proposal "involve[s] unique or unknown environmental risks" since it has proposed regulations specifically aimed at addressing "uncertainty." The § 46.215(d) exception therefore applies.

As another example, § 46.215(e) creates an exception for proposals that "[e]stablish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects." A proposal that would establish "new standards," "revise" the existing regulatory framework, and establish a new presumption against development in Special Areas would clearly set "a precedent for future action." This exception is also satisfied.

As a final example, § 46.215(j) creates an exception for proposals that would "[h]ave a disproportionately high and adverse effect on low income or minority populations." As indicated above, even if the new presumption prevents just one new well site in the NRP-A, then North Slope communities (many of which are both low income and primarily minority) will lose out on

---

[88] *See* 88 Fed. Reg. at 62,032 ("the proposed rule would require the BLM to maintain an IAP, which would help guide BLM use authorizations in the NPR-A but would give way to the regulations in the event of a conflict").

[89] 40 C.F.R. § 1508.1(q)(3).

121219330.4 0010627-00064

millions of dollars that would otherwise have been used for essential social services and needs. This exception is therefore satisfied.

In sum, BLM's attempt to skirt NEPA review is arbitrary and unlawful. For the reasons explained above, the Proposed Rule requires preparation of an EIS to satisfy NEPA.[90] At the bare minimum, BLM should have prepared an environmental assessment to determine if an EIS is required. BLM undertook that basic step in *every* previous NPRPA-related rulemaking, most recently in 2008 when BLM made minor changes to the NPRPA implementing regulations that were far less sweeping and substantive than those proposed by BLM now.[91] BLM's NEPA error here is so obvious that if the Proposed Rule is issued in final without the appropriate NEPA review, it will be found unlawful and vacated when challenged in federal court. Agencies cannot simply exempt a significant proposal from *any* NEPA review without legal consequence.

## H.    The Proposed Rule Fails to Comply with Numerous Executive Orders.

Executive Order 12,866, as amended by Executive Order 14,094 on April 6, 2023, created a centralized review process that directs the Office of Information and Regulatory Affairs ("OIRA") to review drafts of proposed and final federal regulations. One of the primary principles of Executive Order 12,866 includes developing regulations that "assess both the costs and benefits of the intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs."[92]

For rules that an agency or OIRA has identified as a "significant regulatory action," as defined by Section 3(f),[93] Executive Order 12,866 requires an agency to prepare and submit alongside

---

[90] *See Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) ("[T]o prevail on a claim that the Forest Service violated its statutory duty to prepare an EIS, a plaintiff need not show that significant effects will in fact occur. It is enough for the plaintiff to raise substantial questions whether a project may have a significant effect on the environment." (internal citations omitted)).

[91] *See* 73 Fed. Reg. 6,430, 6,439 (Feb. 4, 2008).

[92] Exec. Order No. 12,866 § 1(b)(6), *Regulatory Planning and Review*, 58 Fed. Reg. 51,735 (Sept. 30, 1993); Exec. Order No. 14,094, *Modernizing Regulatory Review*, 88 Fed. Reg. 21,879 (Apr. 6, 2023).

[93] Section 3(f) defines a "significant regulatory action" as a regulatory action that is likely to result in a rule that may:

> (1) have an annual effect on the economy of $200 million or more (adjusted every 3 years by the Administrator of OIRA for changes in gross domestic product); *or* adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, territorial, or tribal governments or communities;

> (2) create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

> (3) materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

> (4) raise legal or policy issues for which centralized review would meaningfully further the President's priorities or the principles set forth in this Executive order, as specifically authorized in a timely manner by the Administrator of OIRA in each case.

the draft rule an "assessment of the potential costs and benefits" of the proposed action and its legal basis.[94] The Proposed Rule states that "OIRA has determined that this proposed rule is significant"[95] but there is no explanation for that determination. A proposed regulation is "economically significant" if it will "have an annual effect on the economy of $200 million or more (adjusted every 3 years by the Administrator of OIRA for changes in gross domestic product)." For "economically significant" rules, a more rigorous cost-benefit analysis must be prepared pursuant to Section 6(a)(3)(C). Here, consistent with its approach of engaging in the least amount of public process and disclosure of information possible, BLM determined that the Proposed Rule is not "economically significant" and prepared the less rigorous cost-benefit analysis under Section 6(a)(3)(B). No documentation for BLM's decision that the Proposed Rule is not "economically significant" was provided for public review.

BLM's determination that the Proposed Rule is not "economically significant" is mistaken. As described above, if the new presumption in proposed subsection 2361.40 results in a single denial of just *one* proposed project for a modest well site producing 10,000 barrels per day, then the foregone economic benefit will be over $200,000,000 annually. That alone makes the Proposed Rule economically significant. In addition, there would likely be numerous other proposals denied and leases not bid as a result of new disincentives contained in the Proposed Rule.[96]

BLM's Economic Analysis also omits recognition or quantification of the well-established public benefits of oil production from the NPR-A. For example, the Economic Analysis fails to discuss the benefits provided by the NPR-A Impact Mitigation Grant Program. This program establishes legal requirements whereby local communities receive generous revenues from NPR-A projects. These revenues are used for essential public services, such as health facilities and educational resources. Additionally, significant revenues for essential state and local government services are generated by production taxes and *ad valorem* taxes. These benefits are also ignored in the Economic Analysis.

Additionally, although BLM's Economic Analysis recognizes the proposed new presumption against development in Special Areas—"there is a presumption of not approving these activities unless there is specific information demonstrating that the activity will lead to no or minimal adverse effects on significant resource values"[97]—it performs *no analysis whatsoever* of the consequences of that presumption. This is arbitrary and capricious, and also in direct conflict with OIRA's guidance regarding cost-benefit analysis:

---

[94] Exec. Order No. 12,866 § 6(a)(3)(B).

[95] 88 Fed. Reg. at 62,037

[96] In the Economic Analysis, BLM considered past leasing activity to evaluate the potential effects and points to historical "low revealed demand" for leases in the Special Areas. But this ignores the fact that interest in leases increases with time due to increased availability of nearby infrastructure to which to connect, making projects more economic. The Economic Analysis also conveniently ignores the years in which NPR-A lease interest was high, such as 2016. Moreover, BLM's conclusion of low demand compared to the rest of the NPR-A is not consistent with the supporting data. Table 3 of the Economic Analysis shows that five out of the nine years assessed had a greater percentage of acres offered that were leased in Special Areas compared to the rest of the NPR-A.

[97] Economic Analysis at 4.

> A good analysis is transparent. It should be possible for a qualified
> third party reading the report to see clearly how you arrived at your
> estimates and conclusions. For transparency's sake, you should
> state in your report what assumptions were used, such as the time
> horizon for the analysis and the discount rates applied to future
> benefits and costs. It is usually necessary to provide a sensitivity
> analysis to reveal whether, and to what extent, the results of the
> analysis are sensitive to plausible changes in the main assumptions
> and numeric inputs.[98]

No such analysis is presented by BLM.

In short, the Proposed Rule does not comply with Executive Order 12,866, as amended by
Executive Order 14,094. The Proposed Rule will have a "significant economic impact" and will
"adversely affect in a material way" the "economy, a sector of the economy, productivity,
competition, jobs, the environment, public health or safety, or State, local, territorial, or tribal
governments or communities."[99] BLM's Economic Analysis is insufficient and omits any
analysis of the effects of regulatory provisions that will have economic impacts, such as the
proposed presumption against permitting activities in Special Areas. If BLM decides to proceed
with the Proposed Rule, it must first prepare for public review and comment the proper analysis
under Section 6(a)(3)(C) of Executive Order 12,866.

BLM also fails to comply with Executive Order 13,211 by not recognizing that the Proposed
Rule constitutes a "significant energy action." A "significant energy action" is a federal action
that (1) meets the definition of a "significant regulatory action" under Executive Order 12,866
*and* is likely to have a significant adverse effect on the supply, distribution, or use of energy, *or*
(2) OIRA deems to be a significant energy action. OMB guidance provides examples of when a
regulatory action has a significant adverse effect on energy, including "reductions in energy
supply and production (including reductions in crude oil supply, in excess of 20 million barrels
per year; in fuel production, in excess of million barrels per year;" "increases in the cost of
energy production or distribution in excess of one percent; material adverse impacts on
productivity, competition, or prices in the energy sector; and material adverse impacts on
productivity, competition, or prices within a region."[100]

BLM concluded that the Proposed Rule is not a "significant energy action" because it "would
restate existing statutory standards and establish a procedural framework for ensuring that the
BLM meets those standards."[101] BLM further justified that position by suggesting that the

---

[98] Office of Information and Regulatory Affairs, Circular A-4, at Section A, Office of Management and
Budget (Sept. 17, 2003).

[99] Exec. Order No. 12,866 § 3(f)(1).

[100] *See* Office of Management and Budget, Memorandum 01-27 at 2-3 (July 13, 2001) (regarding
Guidance for Implementing Exec. Order No. 13,211, *Actions Concerning Regulations That Significantly
Affect Energy Supply, Distribution, or Use*, 66 Fed. Reg. 28,355 (May 22, 2001)).

[101] 88 Fed. Reg. at 62,039.

presumption "merely implements the BLM's existing statutory duty to assure maximum protection of the significant resource values in Special Areas."[102] For all the reasons stated above, both of these justifications are belied by the facts and the law. The Proposed Rule will have significant effects on the supply, distribution, and use of energy and, accordingly, should have been evaluated as a "significant energy action" under Executive Order 13,211.

Finally, BLM has acted in blatant disregard of the important consultation requirements of Executive Order 13,175 ("Consultation and Coordination with Indian Tribal Governments") and the Department of Interior Policy on Consultation with Alaska Native Claims Settlement Act Corporations.[103] BLM sent a letter to Alaska Tribes and Alaska Native Corporations seven business days before publication of the rule "informing them of the rulemaking."[104] This approach fails to meet the numerous consultation requirements detailed at length in Executive Order 13,175 as well as the requirements outlined in the Presidential Memorandum on Tribal Consultation and Nation-to-Nation Building (Jan. 26, 2021), DOI 512 DM 4, and DOI 512 DM 5. The Proposed Rule is unlawful because it fails to comply with all of these essential authorities and directives.

### III. CONCLUSION

AOGA and its members are deeply troubled by both the substantive, unlawful overhaul BLM has proposed for management of the NPR-A and the cryptic, slipshod process BLM has embraced in an apparent attempt to rush this very consequential rulemaking to a final rule with as little public engagement and disclosure of information as possible. We respectfully request BLM's serious and full consideration of these comments. Ultimately, we request that BLM withdraw the Proposed Rule due to is many fatal deficiencies.

Should you have any questions regarding these comments, please do not hesitate to contact me at (907) 222-9602.

Sincerely,

*Kara Moriarty*

**Kara Moriarty**
President/CEO
Alaska Oil and Gas Association

---

[102] *Id.*

[103] *See* U.S. Department of the Interior Indian Affairs, DOI's Alaska Native Corporation Consultation Policy and Procedures, https://www.bia.gov/service/tribal-consultations/dois-alaska-native-corporation-consultation-policy-and-procedures (last visited Dec. 6, 2023).

[104] 88 Fed. Reg. at 62,038.